No. 14-4193

# In the United States Court of Appeals for the Third Circuit

JILL SIKKELEE, APPELLANT

*v.*

PRECISION AIRMOTIVE CORPORATION; PRECISION AIRMOTIVE LLC; BURNS INTERNATIONAL SERVICES CORPORATION; TEXTRON LYCOMING RECIPROCATING ENGINE DIVISION; AVCO CORPORATION; KELLY AEROSPACE, INC.; KELLY AEROSPACE POWER SYSTEMS, INC.; ELECTROSYSTEMS, INC.; CONSOLIDATED FUEL SYSTEMS, INC., APPELLEES

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA (CIV. NO. 07-886) (THE HONORABLE MATTHEW W. BRANN, J.)*

## PETITION FOR REHEARING EN BANC BY APPELLEE AVCO CORPORATION

CATHERINE SLAVIN
SARA ANDERSON FREY
GORDON REES SCULLY MANSUKHANI LLP
 *2005 Market Street, Suite 2900*
 *Philadelphia, PA 19103*
 *(215) 717-4006*

CHRISTOPHER CARLSEN
CLYDE & CO US LLP
 *The Chrysler Building*
 *405 Lexington Avenue*
 *New York, NY 10174*
 *(212) 710-3900*

KANNON K. SHANMUGAM
AMY MASON SAHARIA
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *(202) 434-5000*

# TABLE OF CONTENTS

Page

Statement of counsel ............................................................1

Introduction...........................................................................1

Statement...............................................................................3

Reasons for granting rehearing...........................................7

    A.    The panel's decision conflicts with this Court's previous decisions on the scope of field preemption under the Federal Aviation Act........................................................7

    B.    The panel's decision on this important question conflicts with the longstanding position of the FAA ...................14

Conclusion...........................................................................15

# TABLE OF AUTHORITIES

## CASES

*Abdullah* v. *American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999).........*passim*

*City of Burbank* v. *Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973) ..........2, 8

*Cleveland* v. *Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993)....................9

*Elassaad* v. *Independence Air, Inc.*, 613 F.3d 119 (2010)............................7, 10

*Farina* v. *Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010)...............................................15

*French* v. *Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir. 1989)............................14

*Montalvo* v. *Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007)................................14

*Northwest Airlines, Inc.* v. *Minnesota*, 322 U.S. 292 (1944)............................15

*Public Health Trust* v. *Lake Aircraft, Inc.*, 992 F.2d 291 (11th Cir. 1993) ................................................................................9

Page

Cases—continued:

*Ray* v. *Atlantic Richfield Co.*, 435 U.S. 151 (1978) ..............................................11

*Schneidewind* v. *ANR Pipeline Co.*, 485 U.S. 293 (1988) ...................................8

*Turturro* v. *United States*, 629 Fed. Appx. 313 (3d Cir. 2015) .........................10

*US Airways, Inc.* v. *O'Donnell*, 627 F.3d 1318 (10th Cir. 2010).........................9

## STATUTES AND REGULATIONS

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731...............*passim*

General Aviation Revitalization Act of 1994, Pub. L. No. 103-298,
    108 Stat. 1552 ............................................................................13

49 U.S.C. § 40101 note .......................................................................13

49 U.S.C. § 40120(c) ........................................................................6, 9

49 U.S.C. § 44701 ...............................................................................11

49 U.S.C. § 44701(a) ............................................................................3

49 U.S.C. § 44701(a)(1) ........................................................................3

49 U.S.C. § 44704(a)(1) ........................................................................3

49 U.S.C. § 44704(c) .............................................................................4

49 U.S.C. § 44704(d)(1) ........................................................................4

14 C.F.R. pt. 33....................................................................................3

14 C.F.R. § 21.3 ...................................................................................5

14 C.F.R. § 21.21 .................................................................................3

14 C.F.R. § 21.21(b) .............................................................................3

14 C.F.R. § 21.31 .................................................................................3

Page

Regulations—continued:

14 C.F.R. § 21.33 ....................................................................3

14 C.F.R. § 21.137 .................................................................4

14 C.F.R. § 33.1 .....................................................................3

14 C.F.R. § 33.11 .................................................................12

14 C.F.R. § 33.31 .................................................................12

14 C.F.R. §§ 33.41-33.57 ......................................................3

14 C.F.R. § 91.13(a).............................................................13

## MISCELLANEOUS

H.R. Rep. No. 103-525 (1994) ................................................1

S. Rep. No. 85-1811 (1958) ...................................................1

## STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that the panel's decision is contrary to this Court's decision in *Abdullah* v. *American Airlines, Inc.*, 181 F.3d 363 (1999), and that consideration by the full Court is necessary to secure and maintain the uniformity of this Court's decisions. This appeal also involves a question of exceptional importance: namely, whether the Federal Aviation Act preempts design-defect claims based on state-law standards of care.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

## INTRODUCTION

This case presents one of the most important preemption questions this Court has faced in recent years. The aviation industry "is unique among transportation industries in its relation to the Federal Government." S. Rep. No. 85-1811, at 5 (1958). In 1958, Congress enacted the Federal Aviation Act to "rest sole responsibility for supervising the aviation industry with the federal government." *Abdullah* v. *American Airlines, Inc.*, 181 F.3d 363, 368 (3d Cir. 1999). The Act creates a "cradle to grave" system of federal regulation, resulting in "an industry whose products are regulated to a degree not comparable to any other." H.R. Rep. No. 103-525, pt. 2, at 5-6 (1994).

As the Supreme Court has recognized, "if the congressional objectives underlying the Federal Aviation Act are to be fulfilled," federal regulation

(1)

must be "exclusive." *City of Burbank* v. *Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973). Consistent with that principle, this Court held in *Abdullah* that "federal law establishes the applicable standards of care in the field of air safety, generally, thus preempting the *entire* field from state and territorial regulation." 181 F.3d at 367 (emphasis added).

That holding controls—or should have controlled—this case. Plaintiff here claims that appellee AVCO Corporation, through its Lycoming Engines division, designed a defective aircraft engine. Applying *Abdullah*, the district court determined that federal law provided the standard of care governing plaintiff's claim. But the panel reversed, holding that the Federal Aviation Act does not preempt state-law standards of care in design-defect cases. In so doing, the panel illogically limited *Abdullah* to claims involving aircraft *operations*, notwithstanding *Abdullah*'s holding that federal law provides the standard of care in all cases involving aviation *safety*. And having solicited an amicus brief from the Federal Aviation Administration (FAA), the panel proceeded to reject the FAA's longstanding position that the Federal Aviation Act preempts the entire field of aviation safety, including aircraft design. The panel's decision cannot be reconciled with *Abdullah*, and, if allowed to stand, will undermine the uniform regulatory scheme created by Congress. This Court should grant rehearing en banc to resolve the resulting conflict and to decide a question of exceptional legal and practical importance.

## STATEMENT

1.    The Federal Aviation Act directs the Federal Aviation Administration to regulate virtually every aspect of an airplane's life.  The Act requires the FAA to issue "minimum standards required in the interest of safety  .  .  .  for the design, material, construction, quality of work, and performance of aircraft [and] aircraft engines."  49 U.S.C. § 44701(a)(1).  As is relevant here, the FAA has promulgated regulations establishing comprehensive "airworthiness" standards for the design of aircraft engines.  *See* 14 C.F.R. pt. 33 (2015).  A manufacturer wishing to manufacture an aircraft engine must demonstrate compliance with those standards.  *See* 14 C.F.R. § 33.1.  The regulations also prescribe a detailed battery of tests that an engine must undergo to establish compliance.  *See* 14 C.F.R. §§ 33.41-33.57.

The FAA enforces those standards through a multistep certification process.  At the first step—type certification—the FAA ascertains that an engine "is properly designed and manufactured, performs properly, and meets the regulations and minimum standards prescribed under section 44701(a)."  49 U.S.C. § 44704(a)(1).  An application for a type certificate consists of detailed specifications and the data necessary to show that the engine satisfies the FAA's airworthiness standards.  *See* 14 C.F.R. §§ 21.21, 21.31.  The FAA may inspect and test the engine at this stage.  *See* 14 C.F.R. §§ 21.21(b), 21.33.  At the second step—production certification—the FAA determines whether a manufacturer has "a quality system that ensures that

3

each product and article conforms to its approved design and is in a condition for safe operation." 14 C.F.R. § 21.137; *see* 49 U.S.C. § 44704(c). And at the third step—airworthiness certification—the FAA makes a specific determination whether a particular aircraft "conforms to its type certificate and, after inspection, is in condition for safe operation." 49 U.S.C. § 44704(d)(1).

2.    In 1966, the FAA granted Lycoming a type certificate for the O-320-D2C (O-320) engine. *See* App. A19. In 1969, Lycoming manufactured and sold an O-320 engine. *See* App. A15-A16. The engine remained in long-term storage until 1998, when it was installed on a Cessna 172 aircraft. *See id.* In 2004, a third party overhauled the engine. *See* App. A16-A17. In 2005, the aircraft on which the overhauled engine was installed crashed. *See* App. A15. Plaintiff's husband was flying the aircraft at the time, and he died from injuries sustained in the crash. *See id.*

Plaintiff brought suit in the United States District Court for the Middle District of Pennsylvania against Lycoming and other defendants. *See* D. Ct. Dkt. 1. The original complaint alleged breaches of state common-law standards of care. *See id.* Lycoming moved for judgment on the pleadings, arguing that plaintiff's claims were preempted under *Abdullah*, *supra*. The district court granted the motion. *See* App. A152-A153. In response, plaintiff amended her complaint to allege breaches of federal standards of care contained in FAA regulations. *See* App. A275-A284, A285-A297.

Lycoming then moved for summary judgment on the ground, *inter alia*, that the FAA's issuance of a type certificate demonstrated that the design complied with the federal standards that plaintiff alleged had been breached. The district court granted Lycoming's motion in part. *See* App. A3. It held that the FAA's issuance of a type certificate was "conclusive of the engine's compliance with the design and construction regulations." App. A55. The court explained that allowing juries to second-guess the FAA's conclusion would "result[] in an elusive and undeterminable standard, as opposed to the one, consistent means of regulating aviation safety that Congress intended." App. A54 (internal quotation marks omitted). The court determined, however, that Lycoming was not entitled to summary judgment on plaintiff's claim under 14 C.F.R. § 21.3, which requires type-certificate holders to report certain occurrences to the FAA. *See* App. A60-A65. The district court certified its order for interlocutory appeal, *see* App. A68-A69, and this Court granted plaintiff permission to appeal, *see* App. A1-A2.

3.     After the parties submitted their briefs, the panel invited the FAA to submit an amicus brief "advising on its position" on the preemption issues in the case. 6/17/15 Order. In that brief, and consistent with its longstanding position, the FAA stated that the Federal Aviation Act preempts the field of "aircraft safety" and that "state law standards of care, whether derived from common law or positive enactment, are therefore

preempted." FAA Br. 6. Agreeing with the district court, the FAA stated that "[t]he field preempted by the Federal Aviation Act . . . extends broadly to all aspects of aviation safety and includes product liability claims based on allegedly defective aircraft and aircraft parts by preempting state standards of care." *Id.* at 7.

Consistent with appellee's position, the FAA added that "the conclusion that Congress has preempted states from imposing their own substantive standards of care upon aircraft manufacturers does not necessarily mean that a state tort suit based on those federal standards is preempted." FAA Br. 9-10. Because the Act preserves state "remedies," a plaintiff "may seek to recover in a state-law tort suit against aircraft manufacturers alleged to have violated federal standards, as found in the statute and implementing regulations." *Id.* at 10 (citing 49 U.S.C. § 40120(c)).

The FAA concluded by asserting that, while Congress has occupied the field of aviation safety (and thus preempted state-law standards of care), "the question of the effect a type certificate has in a given case is governed by conflict preemption principles." FAA Br. 10. In cases in which "a plaintiff challenges an aspect of an aircraft's design that was expressly approved by the FAA as shown on the type certificate [and related documents]," the claim is preempted "because a manufacturer is bound to manufacture its aircraft or aircraft part in compliance with the type certificate." *Id.* at 10-11.

4.    The panel vacated and remanded.  *See* slip op. (attached as Exhibit A).  The panel acknowledged that, in *Abdullah*, this Court had stated "in broad terms" that the Federal Aviation Act preempts the "field of aviation safety."  Slip op. 17 (citation omitted).  The panel also noted that, in *Elassaad* v. *Independence Air, Inc.*, 613 F.3d 119 (2010), this Court had identified design-certification requirements as part of the preempted field.  *See* slip op. 18 n.6.  The panel nonetheless concluded that "the field of aviation safety described in *Abdullah* was limited to in-air operations."  *Id.* at 18.  Expressly rejecting the FAA's view, the panel held that the Act does not preempt design-defect claims based on state-law standards of care.  *See id.* at 24-32.  The panel thus did not reach the logically subsequent question of the effect of the FAA's type certification—representing the FAA's determination that a design complies with federal standards—where a plaintiff's tort claim is based on claimed breaches of federal, rather than state, standards.  The panel remanded for the district court to consider whether, despite the absence of field preemption, plaintiff's claims are subject to conflict preemption.  *See id.* at 46.

## REASONS FOR GRANTING REHEARING

### A.    The Panel's Decision Conflicts With This Court's Previous Decisions On The Scope of Field Preemption Under The Federal Aviation Act

1.    Under the doctrine of field preemption, federal law will preempt

state law if Congress "indicate[s] an intent to occupy a given field to the exclusion of state law." *Schneidewind* v. *ANR Pipeline Co.*, 485 U.S. 293, 299-300 (1988). The requisite intent "may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States [or] where the federal interest in the field is sufficiently dominant." *Id.* at 300.

2.    This Court first addressed field preemption under the Federal Aviation Act in *Abdullah*, *supra*. *Abdullah* involved a claim that pilots had failed to take reasonable precautions to avoid turbulence and to provide adequate warning of the turbulence. *See* 181 F.3d at 365. The district court concluded that the Act preempted state regulation of aviation safety, but held that the plaintiffs could recover under state law for the violation of federal standards. *See id.* at 366.

This Court agreed with the district court's analysis (although it ultimately remanded for application of the relevant federal standards). *See* 181 F.3d at 365. Reviewing the Act's legislative history and the Supreme Court's interpretation of the Act in *City of Burbank*, *supra*, this Court concluded that "Congress found the creation of a single, uniform system of regulation vital to increasing air safety." 181 F.3d at 368. The Court observed that Congress intended the FAA to "exercise sole discretion in regulating air safety." *Id.* at 369. On that basis, the Court held that "federal law establishes the applicable standards of care in the field of air safety, generally, thus

8

preempting the entire field from state and territorial regulation." *Id.* at 367. Rejecting the view that federal law only preempts "discrete aspects of air safety," *id.*, the Court underscored that "*any* state or territorial standards of care relating to aviation safety are federally preempted," *id.* at 371.

Notably, the Court considered, and rejected, the reasoning of other courts that had declined to find federal preemption of state standards of care in design-defect cases. *See* 181 F.3d at 372-375 (citing *Cleveland* v. *Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993), and *Public Health Trust* v. *Lake Aircraft, Inc.*, 992 F.2d 291 (11th Cir. 1993)).[1] The Court found those decisions "unpersuasive" on several grounds. *See id.* at 372. As is relevant here, the Court reasoned that the Act's use of the phrase "minimum standards" did not signify that Congress intended to permit States to impose more stringent standards. *See id.* at 373-374. The Court further determined that the Act's savings clause—which provides that "[a] remedy under this part is in addition to any other remedies provided by law," 49 U.S.C. § 40120(c)—did not affect the preemption of state-law standards of care. *See* 181 F.3d at 374-375. Instead, the Court reasoned, the savings clause preserved state-law *remedies* for violation of *federal* standards of care. *See id.* at 375-376.

---

[1] The Tenth Circuit has since disavowed *Cleveland* and joined this Court in holding that the Act preempts the "entire field of aviation safety." *See US Airways, Inc.* v. *O'Donnell*, 627 F.3d 1318, 1326-1327 (10th Cir. 2010) (citing *Abdullah*).

3.     This Court elaborated on the Act's preemptive scope in *Elassaad, supra. Elassaad* involved a negligence claim for injuries suffered as the plaintiff disembarked from a plane. *See* 613 F.3d at 121. The defendant argued that, under *Abdullah*, the claim was governed by federal standards of care. *See id.* at 124. This Court disagreed, explaining that "aviation safety," as that phrase was used in *Abdullah*, meant "in-air safety." *Id.* at 127. The Court noted that "a goal of the [Act] was to reduce accidents in air transportation," and it observed that most of the regulations adopted under the Act— notably, including the regulations containing the "certification" requirements for "aircraft parts"—concern "aspects of safety that are associated with flight." *Id.* at 126-128 (internal quotation marks omitted). Because the plaintiff's claim did not relate to in-air safety, the Court concluded that the Act did not preempt his claim. *Id.* at 131; *see also Turturro* v. *United States*, 629 Fed. Appx. 313, 320 (3d Cir. 2015) (noting that, "[i]n aviation accident cases, . . . federal law provides the standard of care applicable to air safety").

4.     The panel's decision in this case irreconcilably conflicts with this Court's decision in *Abdullah*. The design regulation scheme created by the Act unquestionably relates to in-air safety; after all, plaintiff's claim here is that a design defect in the aircraft engine caused an "accident[] in air transportation." *Elassaad*, 613 F.3d at 126 (citation omitted). And in *Abdullah*, the Court left no doubt as to the breadth of its holding: "we *hold* that federal

10

law establishes the applicable standards of care in the field of air safety, generally, thus preempting the *entire* field from state and territorial regulation." 181 F.3d at 367 (emphases added). The Court did not limit its holding to in-air operations; to the contrary, it suggested that "pilot certification" and "pilot pre-flight duties," among other things, were part of the preempted field. *See id.* at 369. And as discussed above, the Court expressly disagreed with courts that had held that the Act does not preempt state-law design-defect claims. *See id.* at 372-375. The panel's embrace of those very same decisions in this case *in support of* its holding exposes the stark conflict between the two cases. *See* slip op. 54-56.

Beyond the holdings, moreover, the panel's reasoning is flatly inconsistent with this Court's reasoning in *Abdullah*. The panel asserted that the Act does not evince Congress's intent to preempt state standards of care because the Act "says only that the FAA may establish 'minimum standards' for aviation safety." Slip op. 24 (quoting 49 U.S.C. § 44701). As a preliminary matter, the panel's use of the word "may" is incorrect; the statute *requires* the FAA to establish minimum standards. *See* p. 3, *supra*. In any event, the Court expressly rejected precisely that argument in *Abdullah*, *see* 181 F.3d at 373-374, as has the Supreme Court, *see Ray* v. *Atlantic Richfield Co.*, 435 U.S. 151, 168 n.19 (1978) (rejecting the argument that a statutory reference to "minimum standards" forecloses field preemption where it was "sufficient-

ly clear that Congress directed the promulgation of standards on the national level, as well as national enforcement"). The panel also based its conclusion on the Act's savings clause, *see* slip op. 24, but, in *Abdullah*, the Court found that clause to be entirely consistent with the preemption of state-law *standards of care* (as opposed to state-law *remedies*). *See* 181 F.3d at 374-376.

The panel attempted to reconcile its holding with *Abdullah* by distinguishing regulation of aircraft design from regulation of in-air operations. *See* slip op. 28-31. But *Abdullah* rejected the view that the Act preempts only some aspects of air safety. *See* 181 F.3d at 367. Even if the scope of field preemption under the Act could turn on the manner in which the FAA chooses to exercise the "broad authority" conferred by Congress, *id.* at 369, there is no meaningful difference between the FAA's regulation of aircraft design and in-air operations. The panel reasoned that the design regulations "are framed in terms of standards to acquire FAA approvals and certificates—and not as standards governing manufacture generally." Slip op. 28-29. That is simply incorrect. The applicable regulations prescribe "design *and construction* requirements for reciprocating . . . engines." 14 C.F.R. § 33.11 (emphasis added); *see also id.* § 33.31.

The panel also reasoned that the design regulations are not as comprehensive as those analyzed in *Abdullah*. Slip op. 29-30. That is also incorrect. The design regulations—which take up hundreds and hundreds of pages of

the Code of Federal Regulations—contain both substantive design standards and detailed testing requirements intended to ensure that the chosen design satisfies the substantive standards.  And those regulations are part of a comprehensive certification scheme that the panel itself recognized as "intensive and painstaking."  Slip op. 8.

Finally on this score, the panel noted that the FAA's regulations do not contain a catch-all standard of care governing aircraft design, whereas a regulation does prohibit operating an aircraft "in a careless or reckless manner so as to endanger the life or property of another."  Slip op. 30 (quoting 14 C.F.R. § 91.13(a)).  But the fact that the FAA has chosen to issue detailed regulations governing all aspects of aircraft design—rather than rely on a catch-all provision—hardly alters the preemption analysis.  Nor did the panel identify any gap in the FAA's design regulations.[2]

5.    If the panel decision is allowed to stand, district courts will be left to guess about the scope of the preempted field under the Federal Aviation Act in light of this Court's conflicting decisions.  What qualifies as "in-air operations"?  Is regulation of pilot qualifications part of "in-air operations"

---

[2] The panel stated that its conclusion was "solidified by" the General Aviation Revitalization Act of 1994, which established an 18-year repose period for claims against manufacturers arising from general-aviation accidents. *See* slip op. 33 (citing 49 U.S.C. § 40101 note).  But as the FAA has explained, Congress's enactment of that statute—which *limits* the time period for bringing claims against manufacturers—says nothing about an earlier Congress's view on which *standards of care* govern such claims.  *See* FAA Br. 13.

even though it occurs before a plane takes flight?  *See French* v. *Pan Am Express, Inc.*, 869 F.2d 1, 6-7 (1st Cir. 1989) (holding that such regulation was preempted).  Can state tort juries regulate an airline's *pre*-flight warnings?  *See Montalvo* v. *Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) (holding that such a claim was preempted).  The panel decision provides no guidance on how to answer these questions, nor does it identify any affirmative reason why Congress would have intended to distinguish between in-air operations and other aspects of aviation safety such as aircraft design.

### B.    The Panel's Decision On This Important Question Conflicts With The Longstanding Position Of The FAA

Rehearing is independently warranted to permit the entire Court to consider a question of "paramount federal concern."  Br. of United States as Amicus Curiae at 1, *Cleveland* v. *Piper Aircraft Corp.*, No. 91-2065 (10th Cir. Oct. 13, 1992).  For decades and across Democratic and Republican administrations alike, the FAA's position has been that federal law preempts state standards of care in the field of aircraft design.  *See id.*  As the FAA explained almost a quarter century ago:

> Air commerce, by its very nature, transcends state boundaries and is a matter of dominant federal concern.  It cannot remain safe and continue to grow if every plane that rises into the airways is subjected to a multitude of different—and potentially conflicting—state standards of care.

*Id.* at 1-2.  In the same brief, the FAA took the position that the Act "estab-

14

lishes an all-encompassing federal regulatory framework, one that indicates an affirmative congressional intent to occupy the field of air safety." *Id.* at 7. Absent uniform federal regulation, the FAA observed, "[l]ocal . . . barriers to free transit in the air would neutralize [planes'] indifference to space and conquest of time." *Id.* (quoting *Northwest Airlines, Inc.* v. *Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring)). The FAA reaffirmed that position in its amicus brief in this case. *See* FAA Br. 7; pp. 5-6, *supra*.

Although this Court need not defer to an agency's conclusion that state law is preempted, "where the subject matter is technical and the relevant history and background are complex," the Court should at a minimum "defer to an agency's explanation of how state law affects the regulatory scheme." *Farina* v. *Nokia Inc.*, 625 F.3d 97, 126 (3d Cir. 2010) (internal quotation marks omitted). Given the FAA's expertise in administering the complex scheme governing aircraft design established by the Act and its regulations, the FAA's views on the comprehensiveness of that scheme and the need for uniform regulation are entitled to substantial weight. The decision whether to reject the FAA's longstanding position on this important federal question should be made by the full Court. And we respectfully submit that, for the reasons given above, the panel's decision to do so was incorrect.

## CONCLUSION

The petition for rehearing en banc should be granted.

Respectfully submitted,

/s/ Kannon K. Shanmugam

CATHERINE SLAVIN
SARA ANDERSON FREY
GORDON REES SCULLY
  MANSUKHANI LLP
  *2005 Market Street, Suite 2900*
  *Philadelphia, PA 19103*
  *(215) 717-4006*

CHRISTOPHER CARLSEN
CLYDE & CO US LLP
  *The Chrysler Building*
  *405 Lexington Avenue*
  *New York, NY 10174*
  *(212) 710-3900*

MAY 17, 2016

KANNON K. SHANMUGAM
AMY MASON SAHARIA
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellee and a member of the Bar of this Court, certify that, on May 17, 2016, an electronic copy of this Petition for Rehearing En Banc by Appellee AVCO Corporation was filed electronically through the appellate CM/ECF system with the Clerk of Court. I further certify that all parties required to be served have been served.

    /s/ Kannon K. Shanmugam    
KANNON K. SHANMUGAM

Exhibit A

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4193
_____

JILL SIKKELEE,
Individually and as Personal Representative
of the Estate of David Sikkelee, deceased,
                                        Appellant

v.

PRECISION AIRMOTIVE CORPORATION;
PRECISION AIRMOTIVE LLC,
Individually and as Successor-In-Interest
to Precision Airmotive Corporation;
BURNS INTERNATIONAL SERVICES CORPORATION,
Individually and as Successor-In-Interest to Borg-Warner
Corporation, and Marvel-Schebler, a Division of
Borg-Warner Corporation;
TEXTRON LYCOMING RECIPROCATING
ENGINE DIVISION, A Division of Avco Corporation;
AVCO CORPORATION; KELLY AEROSPACE, INC.,
Individually and Joint Venturer and a Successor-In-Interest;
KELLY AEROSPACE POWER SYSTEMS, INC.,
Individually and as Joint Venturer and Successor-In-Interest
a/k/a Electrosystems, Inc.
a/k/a Confuel Inc.;

ELECTROSYSTEMS, INC.,
Individually and as Joint Venturer and as Successor-In-
Interest
a/k/a Consolidated Fuel Systems, Inc.
a/k/a Confuel, Inc.;
CONSOLIDATED FUEL SYSTEMS, INC., a/k/a Confuel,
Inc.

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4-07-cv-00886)
District Judge: Honorable Matthew W. Brann

_____

Argued: June 24, 2015

Before: CHAGARES, KRAUSE, and VAN ANTWERPEN,
*Circuit Judges*

(Filed: April 19, 2016)
_____

John D. McClune, Esq.
Katzman, Lampert & McClune
100 West Big Beaver Road
Suite 130
Troy, MI 48084

Clifford A. Rieders, Esq.
Rieders, Travis, Humphrey, Waters & Dohrmann
161 West Third Street
P.O. Box 215
Williamsport, PA 17701

Tejinder Singh, Esq.          [Argued]
Goldstein & Russell
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
          *Counsel for Appellant*

Christopher Carlsen, Esq.
Clyde & Co US
405 Lexington Avenue
New York, NY 10174

Daniel J. Feith, Esq.
Amy M. Saharia, Esq.
Kannon K. Shanmugam, Esq.      [Argued]
Williams & Connolly
725 12th Street, N.W.
Washington, DC 20005

Sara A. Frey, Esq.
Catherine B. Slavin, Esq.
Gordon & Rees
2005 Market Street
Suite 2900
Philadelphia, PA 19103
          *Counsel for Appellees Avco Corp & Textron Lycoming*
          *Reciprocating Engine Division*

Jeffrey R. White, Esq.
Center for Constitutional Litigation
777 6th Street, N.W.
Suite 250
Washington, DC 20001
        *Counsel for Amicus Appellant*


Jeffrey J. Ellis, Esq.
Quirk & Bakalor
1325 Franklin Avenue Plaza
Suite 250
Garden City, NY 11530,
        *Counsel for Amicus Appellee General Aviation*
        *Manufacturers Association*

Martin S. Kaufman, Esq.
Atlantic Legal Foundation
Room 104
205 East 42nd Street
New York, NY 10017
        *Counsel for Amicus Appellee Atlantic Legal*
        *Foundation and New England Legal Foundation*

Abby C. Wright, Esq.
United States Department of Justice
Civil Division
Room 7252
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
        *Counsel for Amicus Curiae*

---

OPINION

---

KRAUSE, *Circuit Judge*.

This case presents the question whether *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999), in which we held that federal law preempts the field of aviation safety, extends to state law products liability claims. We hold it does not. In light of principles of federalism and the presumption against preemption, Congress must express its clear and manifest intent to preempt an entire field of state law. Here, none of the relevant statutes or regulations signals such an intent. To the contrary, the Federal Aviation Act, the General Aviation Revitalization Act of 1994, and the regulations promulgated by the Federal Aviation Administration reflect that Congress did not intend to preempt aircraft products liability claims in a categorical way. The District Court faithfully sought to apply our precedent, and while it concluded that state products liability claims are preempted by *Abdullah*, it also recognized the question was sufficiently unclear and important to certify its order for interlocutory review. Today, we clarify the scope of *Abdullah* and hold that neither the Act nor the issuance of a type certificate per se preempts all aircraft design and manufacturing claims. Rather, subject to traditional principles of conflict preemption, including in connection with the specifications expressly set forth in a given type certificate, aircraft products liability cases like Appellant's may proceed using a state standard of care. For these reasons, we will reverse the District Court's entry of summary

judgment in favor of Appellees and remand for further proceedings.

## I.    <u>Background</u>

### A.  Overview of Federal Aviation Regulation

Almost immediately after the airplane became a viable means of transportation, it became clear that certain aspects of aviation, such as air traffic control, required uniform federal oversight. *See* Air Commerce Act of 1926, ch. 344, 44 Stat. 568. Congress soon thereafter expanded federal control over aviation by enacting the Civil Aeronautics Act of 1938, which created the Civil Aeronautics Authority ("CAA") to oversee the regulatory aspects of aviation safety and to prescribe "minimum standards governing the design . . . of aircraft, aircraft engines, and propellers as may be required in the interest of safety." Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973, 1007. The 1938 Act also authorized the CAA to issue so-called "type certificates," "production certificate[s]," and "airworthiness certificate[s]" if an airplane or airplane part complied with the relevant safety regulations. *Id.* at 1007, 1009-10.

As the scope of federal involvement in regulating aviation expanded, so too did the number of governmental bodies regulating aviation, and by the 1950s, there had, at one point, been seventy-five different interagency groups with some responsibility in the field. S. Rep. No. 85-1811, at 6 (1958). To resolve this problem, Congress enacted the 1958 Federal Aviation Act, Pub. L. No. 85-726, 72 Stat. 731, to consolidate regulatory authority in a single entity: the Federal Aviation Administration ("FAA"). The Federal Aviation Act adopted verbatim from the Civil Aeronautics Act the statutory

framework for the promulgation of minimum standards for design safety and the process for the issuance of certificates that indicated compliance with those regulations.[1]

Pursuant to the statutory framework established in the Civil Aeronautics Act and adopted by the Federal Aviation Act, aircraft engine manufacturers must obtain from the FAA (1) a *type certificate*, which certifies that a new design for an aircraft or aircraft part performs properly and meets the safety standards defined in the aviation regulations, 49 U.S.C. § 44704(a); 14 C.F.R. § 21.31; and (2) a *production certificate*, which certifies that a duplicate part produced for a particular plane will conform to the design in the type certificate, 49 U.S.C. § 44704(c); 14 C.F.R. § 21.137. Before a new aircraft may legally fly, it must also receive (3) an *airworthiness certificate*, which certifies that the plane and its component parts conform to its type certificate and are in condition for safe operation. 49 U.S.C. §§ 44704(d), 44711(a)(1).

The FAA issues a type certificate when it has determined that a product "is properly designed and

---

[1] The only difference between these portions of the two Acts is that the Federal Aviation Act replaced the word "Authority"—referring to the Civil Aviation Authority created by the 1938 Act—with "Administrator," which refers to the appointed head of the Authority's successor organization, the Federal Aviation Administration. *See also* H.R. Rep. 85-2360, at 16 (1958) (reflecting that, except for certain enumerated changes, "TITLE VI. SAFETY REGULATION OF CIVIL AERONAUTICS [of the Federal Aviation Act] . . . is a reenactment of existing law without substantial change").

manufactured, performs properly, and meets the regulations and minimum standards prescribed under [49 U.S.C. §] 44701(a)."  49 U.S.C. § 44704(a)(1); *see also* 14 C.F.R. § 21.21.  A type certificate includes the type design, which outlines the detailed specifications, dimensions, and materials used for a given product; the product's operating limitations; a "certificate data sheet," which denotes the conditions and limitations necessary to meet airworthiness requirements; and any other conditions or limitations prescribed under FAA regulations.  *See* 14 C.F.R. §§ 21.31, 21.41; FAA, Order 8110.4C, change 5, Type Certification, ch. 3-3(a) (2011).  This certification process can be intensive and painstaking; for example, a commercial aircraft manufacturer seeking a new type certificate for a wide-body aircraft might submit 300,000 drawings, 2,000 engineering reports, and 200 other reports in addition to completing approximately 80 ground tests and 1,600 hours of flight tests.  *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 805 n.7 (1984).  A type certificate remains in effect "until surrendered, suspended, revoked, or a termination date is otherwise established by the FAA."  14 C.F.R. § 21.51.  A manufacturer may make both "major" and "minor" changes to a type certificated design, 14 C.F.R. § 21.93, but must obtain the appropriate regulatory approval to do so, which for "major changes" requires the issuance of an amended or supplemental type certificate by the FAA, *see* 49 U.S.C. § 44704(b); 14 C.F.R. § 21.97; FAA Order 8110.4C, change 1, Type Certification, ch. 4-1(a), 4-2 (2011), and for "minor changes" requires the manufacturer to comply with a pertinent "method acceptable to the FAA," 14 C.F.R. § 21.95.

## B. Factual History

This case involves alleged manufacturing and design defects in a Textron Lycoming O-320-D2C engine ("the engine") manufactured in 1969 and installed "factory new" on a Cessna 172N aircraft ("the aircraft") in 1998. Lycoming holds both a type certificate and production certificate for the engine. The engine in the aircraft was overhauled in 2004 and installed with a MA-4SPA carburetor in accordance with Lycoming's type-certificated design.

David Sikkelee was piloting the aircraft when it crashed shortly after taking off from Transylvania County Airport in Brevard, North Carolina in July 2005. Sikkelee was killed as a result of serious injuries and burns he suffered in the crash. His wife, Jill Sikkelee, the Plaintiff-Appellant in this case, alleges that the aircraft lost power and crashed as a result of a malfunction or defect in the engine's carburetor. Specifically, she contends that, "due to the faulty design of the lock tab washers as well as gasket set," vibrations from the engine loosened screws holding the carburetor's throttle body to its float bowl. J.A. 643. When properly functioning, a carburetor regulates the mixture of fuel and air that enters the engine's cylinders. According to Sikkelee, however, the manner by which the throttle body was attached to the float bowl in the Textron Lycoming O-320-D2C engine allowed raw fuel to leak out of the carburetor into the engine and thereby caused the aircraft to crash.

## C. Procedural History

Sikkelee initially filed a wrongful death and survival action in the Middle District of Pennsylvania in 2007 against seventeen defendants, asserting state law claims of strict

liability, breach of warranty, negligence, misrepresentation, and concert of action. In 2010, the District Court granted defendants' motion for judgment on the pleadings, holding that Sikkelee's state law claims, which were premised on state law standards of care, fell within the preempted "field of air safety" described in *Abdullah*. *Sikkelee v. Precision Airmotive Corp.*, 45 F. Supp. 3d 431, 435 (M.D. Pa. 2014) (quoting *Abdullah*, 181 F.3d at 367). Sikkelee subsequently filed an amended complaint, continuing to assert state law claims, but this time incorporating federal standards of care by alleging violations of numerous FAA regulations.[2] Following certain settlements and motion practice, Sikkelee narrowed her claims against Lycoming to defective design (under theories of both negligence and strict liability) and failure to warn.[3]

---

[2] As summarized by the District Court, Sikkelee specifically alleged that Lycoming had violated, at least, the following regulations: Civil Air Regulations (CARs) §§ 13.100, 13.101, 13.104, 13.110 (1964); 14 C.F.R. §§ 21.2, 21.3, 21.14, 21.21, 21.303, 33.4, 33.15, 33.19, 33.35, 145.221(a) (2004). As described by the District Court, CARs were precursors to modern day Federal Aviation Regulations codified in Title 14 of the Code of Federal Regulations. *Sikkelee*, 45 F. Supp. 3d at 440 n.9 (citing a description of the history of aviation regulations found in 2 Kreindler, *Aviation Accident Law* § 9.01(1)-(2) (Matthew Bender)).

[3] The case then took a detour to this Court to determine whether the Second or Third Restatement of Torts applied to products liability cases. In denying the petition for interlocutory appeal, we clearly indicated that the Third

As the trial date approached, the District Court expressed concern that Sikkelee's proposed jury instructions using federal standards of care were "all but completely unable to assist the Court in . . . formulating an intelligible statement of applicable law." *Sikkelee*, 45 F. Supp. 3d at 437 (internal quotation marks omitted) (recounting its position on this point as first expressed in its Memorandum of November 20, 2013).  On the one hand, the District Court asserted that, under *Abdullah*, it was bound to apply some federal standard of care and that compliance with the applicable design and construction regulations was the only identifiable, let alone articulable, federal standard.  On the other hand, because it determined that the "FAA regulations relating to the design and manufacture of airplanes and airplane component parts were never intended to create federal standards of care," *id.* at 437 n.4 (quoting *Pease v. Lycoming Engines*, No. 4:10-cv-00843, 2011 WL 6339833, at *22 (M.D. Pa. Dec. 19, 2011) (Conner, J.)) (internal quotation marks omitted), the District Court found it to be "arduous and impractical" to fashion the regulations themselves into such standards, *id.* (quoting *Pease*, 2011 WL 6339833, at *23) (internal quotation marks omitted).  Faced with this conundrum, the District Court ordered Sikkelee to submit additional briefing on the question of the appropriate standard of care and, after review of that briefing, invited Lycoming to file a motion for summary judgment. *Id.* at 438.

---

Restatement applied.  *Sikkelee v. Precision Airmotive Corp.*, No. 12-8081, 2012 WL 5077571 (3d Cir. Oct. 17, 2012).  At that point, the case was reassigned from Judge John E. Jones III to Judge Matthew W. Brann.

11

In its ruling on that motion, the District Court concluded that the federal standard of care was established in the type certificate itself.  Reasoning that the FAA issues a type certificate based on its determination that the manufacturer has complied with the pertinent regulations, the District Court held that the FAA's issuance of a type certificate for the Textron Lycoming O-320-D2C engine meant that the federal standard of care had been satisfied as a matter of law.  *Id.* at 451-43, 456.  The District Court therefore granted Lycoming's summary judgment motion, in part, on that basis.  *Id.* at 456.  The District Court denied summary judgment, however, on Sikkelee's failure to warn claims, which were premised on Lycoming's alleged violation of 14 C.F.R. § 21.3 for failure to "'report any failure, malfunction, or defect in any product, part, process, or article'" that Lycoming manufactured.[4]  *Id.* at 459-60 (quoting 14 C.F.R. § 21.3(a) (2004)).

Recognizing that its grant of partial summary judgment raised novel and complex questions concerning the reach of *Abdullah* and the scope of preemption in the airlines industry, the District Court certified the order for immediate appeal, and we granted interlocutory review.

---

[4] Upon receiving a report that a product has malfunctioned or contains a defect, the FAA may issue a legally enforceable airworthiness directive that specifies "inspections you must carry out, conditions and limitations you must comply with, and any actions you must take to resolve an unsafe condition."  14 C.F.R. § 39.11; *see also* 14 C.F.R. §§ 39.3, 39.5.  Any further operation of an aircraft in contravention of an airworthiness directive is a violation of federal law.  14 C.F.R. §§ 39.7, 39.9.

## II.    Jurisdiction and Standard of Review

The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a), and we have jurisdiction under 28 U.S.C. § 1292(b) to review the order certified by the District Court for interlocutory appeal.  We review the District Court's order granting summary judgment de novo.   *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  We also review questions of preemption de novo.   *Farina v. Nokia Inc.*, 625 F.3d 97, 115 n.20 (3d Cir. 2010).

## III.    Discussion

The doctrine of preemption is a necessary but precarious component of our system of federalism under which the states and the federal government possess concurrent sovereignty, subject to the limitation that federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Consistent with this principle, Congress has the power to enact legislation that preempts state law.  *See Arizona v. United States*, 132 S. Ct. 2492, 2500-01 (2012).  At the same time, with due respect to our constitutional scheme built upon a "compound republic," with power allocated between "two distinct governments," The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961); *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring), there is a strong presumption against preemption in areas of the law that States have traditionally occupied, *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 240 (3d Cir. 2009) (explaining that, "[w]hen faced with two equally plausible readings of statutory text, [courts] have a duty to accept the

reading that disfavors preemption" (internal quotation marks omitted)).  For that reason, all preemption cases "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic*, 518 U.S. at 485) (internal quotation marks omitted).  Congressional intent is the "ultimate touchstone" of a preemption analysis.  *Id.*  Thus, when confronted with the question of whether state claims are preempted, as we are here, we look to the language, structure, and purpose of the relevant statutory and regulatory scheme to develop a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic*, 515 U.S. at 486; *see also Bruesewitz*, 561 F.3d at 243-44 (recognizing that divining congressional intent regarding preemption requires considering a law's "structure and purpose," underlying "object and policy," and, where relevant, legislative history (internal quotation marks omitted)).

Congress may exert its supremacy by expressly preempting state law, but it may also do so implicitly, which we have recognized in limited circumstances in the doctrine of "field" preemption.  *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015).  For that doctrine to apply, "we must find that federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law" in that field.  *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 127 (3d Cir. 2010) (quoting *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 336 (3d Cir. 2009)) (alteration and internal quotation marks omitted).  Where Congress expresses

an intent to occupy an entire field, States are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards. *Oneok*, 135 S. Ct. at 1595.

In addition to field preemption, federal law may supersede state law through conflict preemption. This occurs when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2577 (2011), or when a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law," *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (internal quotation marks omitted).

In this case, we are asked to analyze the extent to which federal aviation law preempts state tort law, specifically, products liability claims for defective design. We do not write on a blank slate, but rather, against the backdrop of our decision in *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999).

## A. *Abdullah*

In *Abdullah*, we considered the preemptive effect of federal in-flight seatbelt regulations on state law negligence claims for a flight crew's failure to warn passengers that their flight would encounter severe turbulence. *Id.* at 365. One of the plane's crew members had illuminated the fasten seatbelt sign in accordance with the federal regulations, but none of the crew had given the passengers an additional verbal warning of expected turbulence. *Id.* at 365, 371 & n.11. When the turbulence hit, the plaintiffs suffered serious

injuries. *Id.* at 365. After the jury found American Airlines liable and awarded the plaintiffs damages, the district court ordered a new trial, holding that the Federal Aviation Act preempted the territorial standards for aviation safety, and thus, that the jury should not have been instructed on a territorial standard of care. *Id.* at 365-66. We affirmed, explaining that the Federal Aviation Act and federal regulations "establish complete and thorough safety standards for interstate and international air transportation and that these standards are not subject to supplementation by, or variation among, jurisdictions." *Id.* at 365. Although we held that federal law preempts state law standards of care in the field of air safety, we also held that it preserves state law remedies. *Id.* at 364. As such, within the field of air safety, *Abdullah* instructs that plaintiffs may bring state law causes of action that incorporate federal standards of care. *Id.* at 365.

Our analysis in reaching this conclusion focused on the text and legislative history of the Federal Aviation Act, which was adopted primarily to promote safety in aviation and gave the FAA broad authority to issue safety regulations. *Id.* at 368-69. We observed that the FAA, in exercising this authority, "has implemented a comprehensive system of rules and regulations, which promotes flight safety by regulating pilot certification, pilot pre-flight duties, pilot flight responsibilities, and flight rules." *Id.* at 369 (footnotes omitted). We then reviewed several cases from the Supreme Court and our sister Circuits that had found federal preemption with regard to discrete matters of in-flight operations, including aircraft noise, *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973); pilot regulation, *French v. Pan Am Express, Inc.*, 869 F.2d 1, 6 (1st

Cir. 1989); and control of flights through navigable airspace, *British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 84 (2d Cir. 1977). *Abdullah*, 181 F.3d at 369-71. We paid special heed to 14 C.F.R. § 91.13(a), which proscribes "operat[ing] an aircraft in a careless or reckless manner so as to endanger the life or property of another," and observed that it provided a catch-all standard of care. *Id.* at 371.[5] Thus, we concluded that state law standards of care within the "field of aviation safety" were preempted, and we instructed that "a court must refer . . . to the overall concept that aircraft may not be operated in a careless or reckless manner" in addition to any specific regulations that may be applicable. *Id.*

Importantly for our purposes, although we stated in broad terms that the Federal Aviation Act preempted the "field of aviation safety," *id.*, the regulations and decisions we discussed in *Abdullah* all related to in-air operations, *see* 14 C.F.R. § 1.1 ("Operate, with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose . . . of air navigation including the piloting of aircraft . . . ."), and the catch-all standard of care that we held a court "must refer to" applied only to operating, not designing or manufacturing, an aircraft. *See* 14 C.F.R. §§ 1.1, 91.13.

We confirmed the limits of our holding in *Abdullah* a decade later in *Elassaad*, 613 F.3d at 121, where we clarified that a flight crew's oversight of the disembarkation of

---

[5] The full text of this regulation reads: "Aircraft operations for the purpose of air navigation. No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13(a).

passengers after an airplane came to a complete stop at its destination was not within the preempted field of aviation safety.  By drawing a line between what happens during flight and what happens upon disembarking, we made clear that the field of aviation safety described in *Abdullah* was limited to in-air operations.  *Id.* at 127-31 ("[T]he [Federal Aviation Act's] safety provisions appear to be principally concerned with safety in connection with *operations* associated with flight." (emphasis added)).  *Abdullah* thus does not govern products liability claims like those at issue here. [6]  Indeed, as discussed further below, products liability claims are not subject to the same catch-all standard of care that motivated our field preemption decision in *Abdullah*; the design regulations governing the issuance of type certificates are not as comprehensive as the regulations governing pilot certification, pilot pre-flight duties, pilot flight responsibilities, and flight rules discussed there; and our post-*Abdullah* case law cautions us against interpreting the scope of the preempted field too broadly.  *See Elassaad*, 613 F.3d at 131.

This conclusion is consistent with other courts that have interpreted *Abdullah*.  For example, the Ninth Circuit, which had previously adopted *Abdullah*'s conclusion that the Federal Aviation Act preempts state law standards of care in

---

[6] Appellees point to our passing reference in *Elassaad* that the certification and airworthiness requirements for aircraft parts concern aspects of air safety.  613 F.3d at 128. The certification process, however, had no relevance to the pertinent issues in *Elassaad*, so this statement constituted dicta.  *See In re Nat'l Football League Players Concussion Injury Litig.*, 775 F.3d 570, 583-84 n.18 (3d Cir. 2014).

the field of aviation safety, has held that products liability does *not* fall within that preempted field. *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 809-11 (9th Cir. 2009) (Kozinski, J.). Even the district courts that believed *Abdullah* compelled them to extend the preempted field to products liability claims, including the District Court in this case, have noted that such a holding was at odds with the federal regulatory scheme governing aviation design and manufacturing. *See Sikkelee*, 45 F. Supp. 3d at 460 ("Yet having endeavored to reconcile *Abdullah* with the federal regulatory scheme that governs aviation design and manufacturing, this Court—either by way of its own error or that of the precedents it has followed—has reached holdings that it imagines have little to do with Congressional intent."); *see also Pease*, 2011 WL 6339833, at *22-23 (stating that *Abdullah*'s reasoning is overbroad).

Having concluded that *Abdullah* does not control here, we must now determine whether Congress intended the Federal Aviation Act to preempt products liability claims.

## B. Whether the Presumption Against Preemption Applies

Typically, our preemption analysis begins with the presumption that Congress does not preempt areas of law traditionally occupied by the states unless that is its clear and manifest intent. *Wyeth*, 555 U.S. at 565. In this case, Appellees argue that the presumption against preemption should not apply in the aviation context given the history of federal involvement in the field. That argument turns, however, on a selective view of history.

In general, products liability claims are exemplars of traditional state law causes of action.  *See Medtronic*, 518 U.S. at 491.  Indeed, state law governed the earliest products liability claims in this country.  *See, e.g.*, *Curtain v. Somerset*, 21 A. 244, 244-45 (Pa. 1891) (applying Pennsylvania law); *Thomas v. Winchester*, 6 N.Y. 397, 407-11 (N.Y.  1852) (applying New York law); *see also* Karl N. Llewellyn, *On Warranty of Quality, and Society*, 36 Colum. L. Rev. 699, 732-44 (1936) (discussing distinctions between the early products liability law of the various States).

More specifically, even aviation torts have been consistently governed by state law.  In *The Crawford Bros. No. 2*, 215 F. 269 (W.D. Wash. 1914), which appears to be the earliest tort case involving an aircraft, the court considered the effect of the "legal code of the air" that had been proposed by the International Juridic Committee on Aviation on a salvage claim related to an airplane crash in Puget Sound.  *Id.* at 269-70.  The court posited that, if the code had become law, "it would be important to consider its provisions in determining what was reasonable and proper in a cause involving air craft in a common-law action," much like with rules governing water craft.  *Id.* at 270.  The court ultimately dismissed the suit for lack of jurisdiction, as neither the proposed legal code of the air nor maritime law provided for jurisdiction, and instructed that such questions "must be relegated to the common-law courts."  *Id.* at 271.  The decision in *Crawford Bros.* thus recognized that, absent specific legislation, the common law governed aviation tort claims.

Years later, after Congress passed the 1926 Air Commerce Act but before the current type certification regime was imposed, Judge Buffington authored what

appears to be this Court's first decision involving an aviation-related tort claim, *Curtiss-Wright Flying Service v. Glose*, 66 F.2d 710 (3d Cir.), *cert. denied*, 290 U.S. 696 (1933). There, a widow brought suit against the Curtiss-Wright Flying Service, an early airline, after her husband was killed in a plane crash as a result of negligent operation. *Id.* at 711. We analyzed the claims under common law negligence standards, *see id.* at 712, as no specific legislation or regulation governed those claims. Of course, because that decision preceded *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), our analysis turned on federal, rather than state, common law, but the distinction is not important for our purposes here. Rather, our decision reflects that despite the emergence of federal statutes governing aviation, the common law continued to apply to aviation torts.

Since then, in the absence of applicable statutory or regulatory provisions, we have consistently applied state law to tort claims arising from airplane crashes. Only a month before the Federal Aviation Act was enacted, we were faced with a case involving three claims of defective design against an aircraft manufacturer after its plane broke apart in midair. *Prashker v. Beech Aircraft Corp.*, 258 F.2d 602, 603-04 (3d Cir.), *cert. denied*, 358 U.S. 910 (1958). In concluding that the aircraft manufacturer did not negligently design the plane, we did not exclusively rely on the Civil Aeronautics Board's certification of the relevant design, but rather methodically considered each design defect claim under a common law negligence standard, using the type certificate as but a part of that overall analysis. *Id.* at 605-07; *see also Nw. Airlines v. Glenn L. Martin Co.*, 224 F.2d 120, 124 (6th Cir. 1955), *cert. denied*, 350 U.S. 937 (1956) (confirming the district court's decision to leave the question of a manufacturer's negligent

design to the jury for determination of whether the pertinent state standard of ordinary care was met).

We have done the same in the years since the Federal Aviation Act replaced the Civil Aeronautics Act, *see, e.g., Paoletto v. Beech Aircraft Corp.*, 464 F.2d 976, 978-82 (3d Cir. 1972) (applying a state standard of care to claims for strict liability, negligence, and breach of warranty arising from an airplane crash caused by the collapse of the plane's right wing); *Noel v. United Aircraft Corp.*, 342 F.2d 232, 236-37 (3d Cir. 1964) (rejecting defendant's argument that approval by the Civil Aeronautics Administration of an airplane's propeller system was conclusive of compliance with the standard of care), as have other Courts of Appeals, *see, e.g., Martin*, 555 F.3d at 808; *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 908 (7th Cir. 2007); *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 426 (5th Cir. 2001); *In re Air Crash Disaster*, 86 F.3d 498, 522-23 (6th Cir. 1996); *Pub. Health Trust v. Lake Aircraft, Inc.*, 992 F.2d 291, 293-95 (11th Cir. 1993); *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1441-47 (10th Cir. 1993); *In re N-500L Cases*, 691 F.2d 15, 27-28 (1st Cir. 1982); *Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 411 F.2d 451, 452-53 (2d Cir. 1969); *Banko v. Cont'l Motors Corp.*, 373 F.2d 314, 315-16 (4th Cir. 1966).

Consistent with the uniform treatment of aviation products liability cases as state law torts, we expressly held in *Elassaad* that the presumption against preemption applies in the aviation context.[7]   *See* 613 F.3d at 127 ("When

---

[7] The Tenth Circuit rejected the application of the presumption against preemption in the air operations context on the ground that "the field of aviation safety has long been

considering preemption of an area of traditional state regulation, we begin our analysis by applying a presumption against preemption. . . .  [I]t is appropriate to use a restrained approach in recognizing the preemption of common law torts in the field of aviation." (quoting *Holk*, 575 F.3d at 334) (internal quotation marks omitted)); *Abdullah*, 181 F.3d at 366 ("[We] have addressed claims of preemption with the starting presumption that Congress does not intend to supplant state law.").  Appellees' attempts to set the presumption aside are therefore unavailing.

With this presumption in mind, we must determine whether Congress expressed its clear and manifest intent to preempt aviation products liability claims.  We do so by reviewing the text and structure of the Federal Aviation Act, and, to the extent necessary and relevant to this statute, examining subsequent congressional action that sheds light on its intent.  *See Medtronic*, 518 U.S. at 485-86.  We also consider relevant regulations that have been issued pursuant to the valid exercise of the FAA's delegated authority, which can have the same preemptive effect as federal statutes.  *See Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008).

---

dominated by federal interests."  *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010) (internal quotation marks omitted).  For the reasons discussed above, we respectfully disagree.

### C. Indicia of Congressional Intent

#### 1. The Federal Aviation Act

As we have explained, although the federal government has overseen certain aspects of aviation, such as air traffic control and pilot certification, since the early days of flight, *see* Air Commerce Act of 1926, ch. 344, 44 Stat. 568, there was little question when the Civil Aeronautics Act was adopted in 1938 that common law standards governed tort claims arising from plane crashes, *see, e.g.*, *Curtiss-Wright Flying Serv.*, 66 F.2d at 711-13 (applying the common law standard for negligence). It is therefore significant that the Federal Aviation Act, which succeeded the Civil Aeronautics Act and remains the foundation of federal aviation law today, contains no express preemption provision. In fact, it says only that the FAA may establish "minimum standards" for aviation safety, 49 U.S.C. § 44701—statutory language the Supreme Court has held in other contexts to be insufficient on its own to support a finding of clear and manifest congressional intent of preemption, *see Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 145 (1963); *see also Ray v. Atl. Richfield Co.*, 435 U.S. 151, 168 n.19 (1978); *Abdullah*, 181 F.3d at 373-74; *Cleveland*, 985 F.2d at 1445.

Further, the Federal Aviation Act contains a "savings clause," which provides that "[a] remedy under this part is *in addition* to any other remedies provided by law."[8] 49 U.S.C. § 40120(c) (emphasis added). The Supreme Court observed

---

[8] There is no question that state law provides remedies for products liability claims. *See, e.g.*, *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014).

that this statutory scheme permits states to retain their traditional regulatory power over aspects of aviation. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992) (noting that the Federal Aviation Act's savings clause permitted the States to regulate intrastate airfares and enforce their own laws against deceptive trade practices prior to the 1978 enactment of the Airline Deregulation Act, which *did* expressly preempt state laws relating to the rates, routes, or services of an air carrier). While the inclusion of the savings clause "is not inconsistent" with a requirement that courts apply federal standards of care when adjudicating state law claims, *Abdullah*, 181 F.3d at 374-75, it belies Appellees' argument that Congress demonstrated a clear and manifest intent to preempt state law products liability claims altogether.

Whereas Appellees must show a clear and manifest congressional intent to overcome the presumption against preemption, they instead have mustered scant evidence and, at best, have demonstrated ambiguity. For example, they discuss § 601 of the Federal Aviation Act, which empowers the FAA to promulgate regulations "to promote safety of flight of civil aircraft in air commerce by prescribing . . . minimum standards governing the design, materials, workmanship, construction, and performance of aircraft, aircraft engines, and propellers as may be required in the interest of safety." Federal Aviation Act of 1958, Pub. L. No. 85-726, § 601(a)(1), 72 Stat. 731, 775. Yet, that provision, along with § 603, which provides the statutory framework for the issuance of type certificates, was adopted verbatim from the 1938 Civil Aeronautics Act, *id.* § 603; *see* H.R. Rep. No. 85-2360, at 16 (1958), which clearly did not preempt state law products liability claims, *see supra*, Part III.B. Neither

the Federal Aviation Act nor subsequent amendments substantially changed this statutory framework. *See* Revision of Title 49, United States Code Annotated, "Transportation," Pub. L. No. 103-272, 108 Stat. 745 (1994); *see also* H.R. Rep. No. 103-180, at 343-44 (1993) (discussing changes to the statutory provisions governing the issuance of type certificates as words "added for clarity" and "omitted as surplus").

Appellees thus present no evidence from the Federal Aviation Act's text or extensive legislative history that plausibly suggests Congress intended these same provisions to have a different meaning in the 1958 Act than they had in the 1938 Act. Simply put, if Congress had wanted to change the preemptive effect of the type certification process, it would have done so—or at least given some indication of that intention. It did not. The Federal Aviation Act itself therefore does not signal an intent to preempt state law products liability claims.

## 2. Federal Aviation Regulations

The federal aviation design regulations are likewise devoid of evidence of congressional intent to preempt state law products liability claims. The FAA, in the letter brief it submitted as amicus curiae in this case, takes the position that the Act and these regulations so pervasively occupy the field of design safety that, consistent with *Abdullah*, they require state tort suits that survive a conflict preemption analysis to proceed under "federal standards of care found in the Federal

Aviation Act and its implementing regulations."  Letter Br. of Amicus Curiae Fed. Aviation Admin. 11 ("FAA Ltr. Br."). [9]

We do not defer to an agency's view that its regulations preempt state law, but we do recognize that agencies are well equipped to understand the technical and complex nature of the subject matter over which they regulate and thus have a "unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Wyeth*, 555 U.S. at 576-77 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal quotation marks omitted); *see also Farina*, 625 F.3d at 126.  We therefore consider the FAA's "explanation of state law's impact on the federal scheme" governing aircraft design and manufacture, but "[t]he weight we accord [its] explanation . . . depends on its thoroughness, consistency, and persuasiveness."  *Wyeth*, 555 U.S. at 577 (citing *United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *Farina*, 625 F.3d at 126-27 & n.27.  Specifically, its views as presented in an

---

[9] At our request, the FAA submitted a letter brief specifically to address the scope of field preemption, the existence and source of any federal standard of care for design defect claims, and the role of the type certificate in determining whether the relevant standard of care had been met.  For the reasons set forth below, we are not persuaded by the FAA's position on field preemption and the applicable standard of care.  However, we do find persuasive its views on the relevance of the type certification process to a conflict preemption analysis.  *See infra* Part III.D.2.

amicus brief are "'entitled to respect' only to the extent [they] ha[ve] the 'power to persuade.'" *See Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (quoting *Skidmore*, 323 U.S. at 140); *see also Farina*, 625 F.3d at 126-27.

Here, three fundamental differences between the regulations at issue in *Abdullah* and those concerning aircraft design, along with the agency's inability to specifically identify or articulate the proposed federal standard of care, lead us to disagree with this aspect of the FAA's submission. First, the regulations governing in-flight operations on their face "prescribe[] rules governing the operation of aircraft . . . within the United States." 14 C.F.R. § 91.1(a); *see also* 14 C.F.R. § 121.1(e) (prescribing rules governing "[e]ach person who is on board an aircraft being operated under this part"). In contrast, the manufacturing and design regulations prescribe "[p]rocedural requirements for issuing and changing – (i) Design approvals; (ii) Production approvals; (iii) Airworthiness certificates; and (iv) Airworthiness approvals" and "[r]ules governing applicants for, and holders of" such approvals and certificates. 14 C.F.R. § 21.1(a). That is, these regulations do not purport to govern the manufacture and design of aircraft per se or to establish a general standard of care but rather establish procedures for manufacturers to obtain certain approvals and certificates from the FAA, *see generally* 14 C.F.R. § 21, and in the context of those procedures, to "prescribe[] airworthiness standards *for the issue of type certificates*," 14 C.F.R. § 33.1(a) (aircraft engines) (emphasis added); *see also* 14 C.F.R. §§ 23.1(a), 25.1(a), 27.1(a), 29.1(a), 31.1(a), 35.1(a). Of course, the issuance of a type certificate is a threshold requirement for the lawful manufacture and production of component parts and, at least to that extent, arguably reflects nationwide

standards for the manufacture and design of such parts.  But the fact that the regulations are framed in terms of standards to acquire FAA approvals and certificates—and not as standards governing manufacture generally—supports the notions that the acquisition of a type certificate is merely a baseline requirement and that, in the manufacturing context, the statutory language indicating that these are "minimum standards," 49 U.S.C. § 44701, means what it says.

Second, the standards that must be met for the issuance of type certificates cannot be said to provide the type of "comprehensive system of rules and regulations" we determined existed in *Abdullah* to promote in-flight safety "by regulating pilot certification, pilot pre-flight duties, pilot flight responsibilities, and flight rules." *Abdullah*, 181 F.3d at 369 (footnotes omitted).  Rather, many are in the nature of discrete, technical specifications that range from simply requiring that a given component part work properly, *e.g.*, 14 C.F.R. § 33.71(a) (providing that a lubrication system "must function properly in the flight altitudes and atmospheric conditions in which an aircraft is expected to operate"), to prescribing particular specifications for certain aspects (and not even all aspects) of that component part, *e.g.*, 14 C.F.R. § 33.69 (providing that an electric engine ignition system "must have at least two igniters and two separate secondary electric circuits, except that only one igniter is required for fuel burning augmentation systems").  The regulation governing the fuel and induction system at issue in this case, for example, specifies that this part of the engine "must be designed and constructed to supply *an appropriate mixture* of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions."  14 C.F.R. § 33.35(a) (emphasis added).  As the District Court

observed, the highly technical and part-specific nature of these regulations makes them exceedingly difficult to translate into a standard of care that could be applied to a tort claim.

Third, the regulations governing in-flight operations "suppl[y] a comprehensive standard of care," *Abdullah*, 181 F.3d at 371, that could be used to evaluate conduct not specifically prescribed by the regulations, i.e., that a person must not "operate an aircraft in a careless or reckless manner so as to endanger the life or property of another," 14 C.F.R. § 91.13(a).  We recognized in *Abdullah* that § 91.13(a) sounds in common law tort, making it appropriate and practical to incorporate as a federal standard of care in state law claims concerning in-flight operations and rendering existing state law standards of care duplicative (if not conflicting with them outright).  *Abdullah*, 181 F.3d at 371, 374.  Neither the FAA nor Appellees have pointed us to any analogous provision for aircraft manufacture and design, nor have we identified one.[10]

---

[10] Although Appellees suggest 49 U.S.C. § 44701(a)(5) and CAR §§ 13.100-101, 13.104 (1964) as candidates for an equivalent to § 91.13(a), neither states a workable standard of care.  The first simply describes what types of regulations the FAA is authorized to promulgate by directing the agency to prescribe "regulations and minimum standards for other practices, methods, and procedures the Administrator finds necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a)(5).  The second establishes "standards with which compliance shall be demonstrated for the issuance of and changes to type certificates for engines used on aircraft." CAR § 13.0 (1964).  Neither provision purports to,

We therefore agree with the District Court that neither the Federal Aviation Act nor the associated FAA regulations "were [ever] intended to create federal standards of care" for manufacturing and design defect claims. *Sikkelee*, 45 F. Supp. 3d at 437 n.4 (internal quotation marks omitted) (describing the District Court's reasoning in its earlier memorandum responding to proposed jury instructions and citing *Pease*, 2011 WL 6339833, at *22-23). However, the District Court proceeded from that accurate premise to a faulty conclusion (the one urged by Appellees), i.e., that because there is no federal standard of care for these claims in the statute or regulations, the issuance of a type certificate must both establish and satisfy that standard. Not so. In light of the presumption against preemption, absent clear evidence that Congress intended the mere issuance of a type certificate to foreclose all design defect claims, state tort suits using state standards of care may proceed subject only to traditional conflict preemption principles.

Besides preserving principles of federalism, this conclusion avoids interpreting the Federal Aviation Act in a way that would have "the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation." *Medtronic*, 518 U.S. at 487. Conversely, were we to adopt Appellees' position, we would be holding, in effect, that the mere issuance of a type certificate exempts designers and manufacturers of defective airplanes from the bulk of liability for both individual and large-scale air catastrophes. While Appellees answer that

---

nor could, practically function as a general standard of care for products liability claims.

"failure to report defects" claims could still proceed under state law, as the District Court permitted here, even Appellees acknowledge that, at best, only some "percentage of claims that are theoretically available would be left under [their] interpretation . . . ."  Oral Arg. at 35:01, 42:54 (argued June 24, 2015).[11]

In short, like the manufacturer in *Medtronic*, Appellees would have us adopt the position that "because there is no explicit private cause of action against manufacturers contained in the [Act], and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by defective [aircraft parts]."  *Medtronic*, 518 U.S. at 487.  Like the Supreme Court in *Medtronic*, however, we find it "to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.'"  *Id.* (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)).

These observations lead us to conclude that the Federal Aviation Act and its implementing regulations do not indicate a clear and manifest congressional intent to preempt state law products liability claims; Congress has not created a federal standard of care for persons injured by defective airplanes; and the type certification process cannot as a categorical matter displace the need for compliance in this context with state standards of care.

---

[11] An audio recording of the oral argument is available online, at http://www2.ca3.uscourts.gov/oralargument/audio/14-4193JillSilleleev.PrecisionAirmotiveCorp.mp3.

### 3. GARA

Our conclusion is solidified by the General Aviation Revitalization Act of 1994 ("GARA"), Pub L. No. 103-298, 108 Stat. 1552 (codified at 49 U.S.C. § 40101 note). In that statute, Congress created a statute of repose that, with certain exceptions, bars suit against an aircraft manufacturer arising from a general aviation accident brought more than eighteen years after the aircraft was delivered or a new part was installed.[12] 49 U.S.C. § 40101 note § 3(3). GARA was adopted to limit the "long tail of liability" imposed on manufacturers of general aviation aircraft. *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 951 (9th Cir. 2008) (quoting *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1084 (9th Cir. 2001)).

By barring products liability suits against manufacturers of these older aircraft parts, GARA necessarily implies that such suits were and are otherwise permitted. Indeed, GARA's eighteen-year statute of repose would be superfluous if all aviation products liability claims are preempted from day one. Because we must "interpret a statute so as to 'give effect to every word of a statute wherever possible,'" *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 165 (3d Cir. 2015) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 12

---

[12] "General aviation aircraft" is defined in GARA as any aircraft with a maximum seating capacity of fewer than 20 passengers that was not engaged in scheduled passenger-carrying operations at the time of the accident. 49 U.S.C. § 40101 note § 2(c). In other words, general aviation is distinct from larger-scale commercial aviation.

(2004)), GARA reinforces what is now apparent: Federal law does not preempt state design defect claims.    Rather, Congress left state law remedies in place when it enacted GARA in 1994, just as it did when it enacted the Civil Aeronautics Act in 1938 and the Federal Aviation Act in 1958.

Appellees argue that GARA would not be entirely superfluous because general aviation manufacturers would "remain subject to state tort remedies for actual violations of federal aviation safety standards," Appellee's Br. 51, such as the failure to disclose defects discovered after a type certificate has been issued or the failure to comply with an airworthiness directive, Oral Arg. at 35:20, 37:00.    Those kinds of claims, however, are already expressly exempted in § 2(b)(1) from GARA's statute of repose.[13]    In sum, if GARA

---

[13] In full, this exception provides that GARA's statute of repose does not apply

> if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system,

and its § 2(b)(1) carveout are to serve their stated purpose, the state law claims to which GARA's statute of repose applies must not be preempted.

Our interpretation of the Federal Aviation Act is only bolstered by GARA's legislative history. We are mindful, of course, that "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material," as legislative history can be "murky, ambiguous, and contradictory." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). Here, however, the legislative history is none of those things. GARA's legislative history states explicitly what is implied by the statutory text: Aviation products liability claims are governed by state law. *See* H.R. Rep. No. 103-525, pt. 2, at 3-7 (1994). The House Report begins by stating that "[t]he liability of general aviation aircraft manufacturers is governed by tort law" that "is ultimately grounded in the experiences of the legal system and values of the citizens of a particular State." *Id.* at 3-4. In enacting GARA, Congress "voted to permit, in this exceptional instance, a very limited Federal preemption of

---

subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered.

49 U.S.C. § 40101 note § 2(b)(1). This provision would exempt from the statute of repose claims that are based on a manufacturer's misrepresentations and omissions with regard to a type certificate or the continuing airworthiness of a plane or its component part, such as a manufacturer's failure to comply with a type certificate or failure to report required information to the FAA.

State law," that is, only where GARA's statute of repose has run are state law claims preempted. *Id.* at 4-7. "[I]n cases where the statute of repose has not expired, State law will continue to govern fully, unfettered by Federal interference."[14] *Id.* at 7.

---

[14] Appellant notes that, as indicated in the House Report accompanying GARA, prior legislative efforts to explicitly federalize aviation tort law failed to get off the ground. H.R. Rep. No. 103-525, pt. 2, at 6 & n.11 (referencing failed bill H.R. 5362, 102d Cong. (1992)); *see* Appellant's Br. 9. For example, H.R. 5362 would have explicitly preempted state tort claims against aircraft manufacturers arising out of general aviation accidents, put in place substantive legal rules for such actions (e.g., applying principles of comparative responsibility in such cases), and imbued federal courts with original, concurrent jurisdiction to adjudicate such claims. Although Appellant seems to be suggesting that such proposed bills reflect Congress's belief at the time that the field of aviation products liability was not preempted—and, thus, remains so today absent legislation to the contrary—we take no confidence in the reading of tea leaves left behind by failed legislative efforts. For, while on rare occasion the Supreme Court has described legislative inaction as "instructive" but "not conclusive," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989) (internal quotation marks omitted), it far more often, and with good reason, has emphasized its "reluctan[ce] to draw inferences from Congress'[s] failure to act," *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155 (2000) (declining to "rely on Congress'[s] failure to act").

Appellees attempt to discount GARA's significance, arguing that the views of Congress in 1994 "form a hazardous basis for inferring the intent" of the 1958 Congress that enacted the Federal Aviation Act.  Appellee's Br. 41 (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)).  It is true that "the weight given subsequent legislation and whether it constitutes a clarification or a repeal is a context- and fact-dependent inquiry," *Bd. of Trs. of IBT Local 863 Pension Fund v. C & S Wholesale Grocers, Inc.*, 802 F.3d 534, 546 (3d Cir. 2015), but there are circumstances where its consideration is appropriate.  Indeed, the Supreme Court relied on precisely this type of analysis in determining congressional intent in the preemption context in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984).  There, the Court considered the question of whether state law actions for punitive damages were subject to field preemption under the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2284.  *Silkwood*, 464 U.S. at 241.  The Atomic Energy Act itself was silent on the preemption of state tort claims, but, when it was subsequently amended by the Price-Anderson Act, Pub. L. No. 85-256, 71 Stat. 576 (1957), the accompanying Joint Committee Report reflected an assumption that state law would apply in the absence of subsequent legislative action.  *Id.* at 251-54.  The Supreme Court found this legislative history to be persuasive in concluding that Congress did not intend to foreclose state remedies for those injured by nuclear accidents by way of field preemption.  *Id.* at 256.

More recently, in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), the Supreme Court held that disparate impact claims were cognizable under the 1968 Fair Housing Act ("FHA"), relying in part on the "crucial[ly] importan[t]"

fact that Congress had adopted amendments to the Act in 1988 that assumed the existence of such claims. *Id.* at 2519-20. Because the amendments would make sense only if disparate impact liability existed under the FHA, the Court reasoned that the most logical conclusion was that Congress presupposed the existence of disparate impact claims under the FHA as it had been enacted in 1968. *Id*. at 2520-21.

Consistent with the Supreme Court's approach and our recent guidance in *Board of Trustees of IBT Local 863 Pension Fund*, we may pay heed to the significance of subsequent legislation when it is apparent from the facts and context that it bears directly on Congress's own understanding and intent. Here, the Federal Aviation Act itself neither states nor implies an intent to preempt state law products liability claims, and GARA confirms that Congress understood and intended that Act to preserve such claims. Thus, despite Appellees' exhortations, we cannot infer a clear and manifest congressional purpose to preempt these claims where the indicia of congressional intent, including in this case the assumptions underlying subsequent legislation, point overwhelmingly the other way.

### D. Relevant Preemption Precedent

We turn next to Appellees' contention that the Supreme Court's preemption jurisprudence compels us to find that federal law occupies the entire field of aircraft design and manufacture and that the issuance of a type certificate conclusively demonstrates compliance with the corresponding federal standard of care. Appellees argue that: (1) the Court has accorded broad field preemption to analogous statutory regimes governing oil tankers and locomotives; (2) the Court has given broad preemptive effect to analogous premarket

approval processes in the medical device context; and (3) other Courts of Appeals have recognized preemption of the field of aviation safety. For its part, the FAA argues that the mere issuance of a type certificate does not preempt all design defect claims concerning the certificated part but that specifications expressly embodied in a type certificate may, in a given case, preempt such claims under traditional conflict preemption principles. We address Appellees' arguments below and conclude that the case law of the Supreme Court and our sister Circuits supports the application of traditional conflict preemption principles but not preemption of the entire field of aviation design and manufacture.

### 1. Field Preemption in Analogous Statutory Regimes

Although they acknowledge that the Supreme Court has not addressed whether the Federal Aviation Act preempts the field of aviation design and manufacture, Appellees argue on the basis of other Supreme Court precedent that we should affirm the reasoning of the District Court. First, Appellees point to the Supreme Court's observation in *City of Burbank*, 411 U.S. at 639, that the Federal Aviation Act "requires a uniform and exclusive system of federal regulation if the congressional objectives underlying [it] are to be fulfilled" as evidence that the Supreme Court has concluded the FAA occupies the entire field of aviation safety. That begs the question, however, of the scope of the field in question. In *City of Burbank*, the Court held only that Congress had preempted the field of aircraft noise regulation. *Id.* at 633, 638-40. Even in interpreting the express preemption clause

of the Airline Deregulation Act, [15] the Court has taken a cautious approach, holding that plaintiffs' claims under state consumer protection statutes are preempted but that related state law claims for breach of contract are not. *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 223, 227-33 (1995); *Morales*, 504 U.S. at 391. The Supreme Court also has observed in dicta that state tort law "plainly appl[ies]" to aviation tort cases and that Congress would need to enact legislation "[i]f federal uniformity is the desired goal with respect to claims arising from aviation accidents." *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 273-74 (1972). The Court's few pronouncements in the area of aviation preemption, in other words, offer little support for the broad field preemption Appellees seek.

Appellees next compare aircraft to oil tankers and locomotives, urging that the broad scope of field preemption recognized by the Supreme Court in those industries should extend as well to aircraft design defect claims. As Appellees point out, the Supreme Court has found field preemption of oil tanker design, operation, and seaworthiness under Title II of the Ports and Waterways Safety Act and concluded state regulations that impose additional crew training requirements and mandate standard safety features on certain boats fall within this preempted field. *United States v. Locke*, 529 U.S.

---

[15] The Airline Deregulation Act, Pub. L. No. 95-504, § 105(a)(1), 92 Stat. 1705, 1708 (1978), expressly preempted state law claims "relating to rates, routes, or services of any air carrier." In light of nonsubstantive amendments by Congress, today's iteration of the express preemption clause precludes state law claims "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

89, 109-14 (2000); *Ray*, 435 U.S. at 158-68.  Appellees also refer to decisions that have found field preemption of design defect claims in the railroad context, *see Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1267-68 (2012); *Del. & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*, 781 F.3d 656, 661-62 (3d Cir. 2015).

We do not find either of these analogies apt.  As to tankers, the Supreme Court subsequently distinguished *Ray* and *Locke* on the grounds that both cases invalidated state regulations that created positive obligations, and neither of those cases "purported to pre-empt possible common law claims," *Sprietsma v. Mercury Marine*, 537 U.S. 51, 69 (2002), such as the aviation tort claims at issue here.  As to locomotives, the Supreme Court and our own Court were bound to find such design defect claims preempted by the Supreme Court's ninety-year-old precedent in *Napier v. Atlantic Coast Line Railway Co.*, 272 U.S. 605 (1926), which held that the Locomotive Inspection Act preempts "the field of regulating locomotive equipment used on a highway of interstate commerce," including "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances."  *Id.* at 607, 611.

Far more apropos in the transportation industry is the Supreme Court's conflict preemption approach in the context of automobiles and boats, for just as the Federal Aviation Act directs the FAA to "prescrib[e] minimum standards required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers," 49 U.S.C. § 44701(a)(1), the National Traffic and Motor Safety Act of 1966 ("NTMSA") empowers the National Highway Traffic Safety Administration to "prescribe motor vehicle safety

standards for motor vehicles and motor vehicle equipment," 49 U.S.C. § 30101(1), and the Federal Boat Safety Act of 1971 ("FBSA") authorizes the Secretary of Transportation to issue regulations "establishing minimum safety standards for recreational vessels and associated equipment," 46 U.S.C. § 4302(a)(1).[16]  Moreover, like the Federal Aviation Act, the NTMSA and FBSA both contain savings clauses.  49 U.S.C. § 30103(e); 46 U.S.C. § 4311(g).

In assessing implied preemption under these statutory schemes, the Supreme Court has found that the statutory language and applicable regulations support not field preemption, but rather a traditional conflict preemption analysis.  In the automobile context, for example, the Court held that a federal regulation governing air bag usage implicated a significant federal regulatory objective—maintaining manufacturer choice—and therefore preempted a state law tort claim, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 875, 886 (2000), while another regulation governing seatbelt usage did not reflect a similarly significant federal

---

[16] Appellees argue that the Federal Aviation Act's mandate that the FAA Administrator establish "minimum" standards in both Section 604 (pertaining to operations) and Section 601(a) (pertaining to aircraft design and manufacture) justifies the extension of *Abdullah* field preemption to both areas.  Appellees' Br. 34 (citing §§ 101(3), (10), (21); 601(a)(1)-(5)).  In *Abdullah*, however, we observed that the reference to "minimum standards" did not *preclude* a finding of field preemption; we did not hold that it required or even supported it.  *See Abdullah*, 181 F.3d at 373-74.

objective and thus did not preempt state law claims, *Williamson*, 562 U.S. at 336.

Similarly, in *Sprietsma*, the Court held that the Federal Boat Safety Act did not preempt the field of "state common law relating to boat manufacture," but nonetheless applied a conflict preemption analysis to determine whether petitioner's tort law claims were preempted by the Federal Boat Safety Act ("FBSA") or the Coast Guard's decision not to promulgate a regulation requiring propeller guards on motorboats. 537 U.S. at 60-70. The Court held that the Coast Guard's decision not to regulate did not preclude "a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat equipped with respondent's particular type of motor" because the Coast Guard's decision "does not convey an 'authoritative' message of a federal policy against propeller guards." *Id.* at 67.[17]

---

[17] We recognize that, unlike the Federal Aviation Act, the NTMSA and the FBSA also contain express preemption clauses. 49 U.S.C. § 30103(b)(1); 46 U.S.C. § 4306. Despite these clauses, however, the Supreme Court still conducted a conflict preemption analysis in *Geier* and *Sprietsma* rather than a field preemption analysis because it determined that, while an express preemption clause may indicate some congressional desire to "subject the industry to a single, uniform set of federal safety standards," the presence of a savings clause simultaneously "reflects a congressional determination that occasional nonuniformity is a small price to pay for a system in which juries . . . enforce[] safety standards [and] . . . provid[e] necessary compensation to victims." *Geier*, 529 U.S. at 867-71; *see also Sprietsma*, 537

In sum, the Supreme Court's preemption cases in the transportation context support that aircraft design and manufacture claims are not field preempted, but remain subject to principles of conflict preemption.

## 2. Type Certification As Support for Field Preemption

Appellees also assert that because type certificates represent the FAA's determination that a design meets federal safety standards, allowing juries to impose tort liability notwithstanding the presence of a type certificate would infringe upon the field of aviation safety as defined in *Abdullah* and would fatally undermine uniformity in the federal regulatory regime. Appellees' Br. 44-45 (quoting *City of Burbank,* 411 U.S. at 639). In support of this argument, Appellees rely on *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), in which state tort claims were deemed preempted by an express preemption clause where the plaintiff challenged the safety of a medical device that had received preapproval from the Food and Drug Administration. *Id.* at 330. Although there is no express preemption clause here, Appellees posit that the FAA's type certification process should be accorded a similar field preemptive effect.

The FAA, on the other hand, argues that type certification is relevant only to an analysis under "ordinary

---

U.S. at 62-65. Because the Court has been willing to apply conflict rather than field preemption even in situations where an *express* preemption clause is at play, conflict preemption appears especially apt in a case like this one where there is no such clause to counsel in favor of field preemption.

conflict preemption principles." [18]   FAA Ltr. Br. 2.   Thus, according to the FAA, "[i]t is . . . only where compliance with both the type certificate and the claims made in the state tort suit 'is a physical impossibility[]'; or where the claim 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' that the type certificate will serve to preempt a state tort suit."  *Id.* at 10 (first quoting *Fla. Lime & Avocado Growers, Inc.*, 373 U.S. at 142-43; then quoting *Geier*, 529 U.S. at 873).   This, the FAA contends, strikes the right balance in the interests of federalism because:

> to the extent that a plaintiff challenges an aspect of an aircraft's design that was expressly approved by the FAA as shown on the type certificate, accompanying operating limitations, underlying type certificate data sheet, or other form of FAA approval incorporated by reference into those materials, a plaintiff's state tort suit arguing for an alternative design would be preempted under conflict preemption principles . . . . because a manufacturer is bound to manufacture its aircraft or aircraft part in compliance with the type certificate.

*Id.* at 10-11.  On the other hand, "to the extent that the FAA has not made an affirmative determination with respect to the challenged design aspect, and the agency has left that design

---

[18]   Even with regard to those claims not preempted by conflict preemption, the FAA contends that a federal standard of care should apply.  FAA Ltr. Br. 11.  For the reasons set forth above, we have rejected that contention.  *See supra* Part III.C.2.

aspect to the manufacturer's discretion, the claim would not be preempted." *Id.* at 11.[19]

We have no need here to demarcate the boundaries of those tort suits that will be preempted as a result of a conflict between state law and a given type certificate, nor which FAA documents incorporated by reference in a type certificate might give rise to such a conflict. While the parties responded to the FAA's submission by arguing for the first time in supplemental submissions whether the alleged design defect at issue in this case is a design aspect that was expressly incorporated into the type certificate for the Textron Lycoming O-320-D2C engine and what significance that might have for conflict preemption, we will leave those issues for the District Court to consider on remand. *See, e.g., Miller v. Mitchell*, 598 F.3d 139, 148 (3d Cir. 2010) (remanding consideration of an issue discussed in supplemental briefing on appeal but not addressed by the district court in the first instance). For today, we hold only that, consistent with the FAA's view, type certification does not itself establish or satisfy the relevant standard of care for tort actions, nor does it evince congressional intent to preempt the field of products liability; rather, because the type certification process results

---

[19] A type certificate thus would not create such a conflict in the FAA's view where unilateral changes are permissible without preapproval or where an allegation of negligence arises after the issuance of a type certificate, such as claims related to a manufacturer's maintenance of an aircraft, issuance of service bulletins to correct an issue that has come to the manufacturer's attention, or failure to conform its manufacturing process to the specifications in the type certificate. *See* FAA Ltr. Br. 10-11, 12-13 n.2.

in the FAA's preapproval of particular specifications from which a manufacturer may not normally deviate without violating federal law, the type certificate bears on ordinary conflict preemption principles. *See Wyeth*, 555 U.S. at 576-77 (according "some weight" to an agency's "unique understanding" of "state law's impact on [a] federal scheme" insofar as its views are "thorough[], consisten[t], and persuasive[]"); *accord Farina*, 625 F.3d at 126-27.

Indeed, when confronting an analogous preapproval scheme for pharmaceutical labeling, the Supreme Court has held that, where manufacturers are unable to simultaneously comply with both federal and state requirements, state law design defect claims are conflict preempted, not field preempted. *See Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013); *PLIVA*, 131 S. Ct. at 2577. Before a new drug may legally be distributed in the United States, both its contents and its labeling must be preapproved by the FDA. 21 U.S.C. §§ 355(a), (b)(1)(F). In a series of recent preemption cases, the Court has distinguished between brand-name drugs and their generic equivalents, determining that at least some state law tort claims may be brought against brand-name drug companies because such companies have the ability to make some *unilateral* changes to their labels without additional regulatory preapproval, *Wyeth*, 555 U.S. at 572-73, 581, but such claims against generic drug manufacturers cannot survive a conflict preemption analysis because the generic manufacturers are bound by federal law to directly mimic their brand-name counterparts, *Bartlett*, 133 S. Ct. at 2473, 2480; *PLIVA*, 131 S. Ct. at 2577-81.[20]

---

[20] In the case of a new brand-name drug, FDA approval can be secured only by submitting a new drug application

Ultimately, where a party cannot "independently do under federal law what state law requires of it," the state law is conflict preempted. *PLIVA*, 131 S. Ct. at 2579.

The same considerations apply to the case before us. The FAA's preapproval process for specifications embodied or incorporated into a type certificate, which precludes a manufacturer from making at least "major changes" [21] to a

---

("NDA"), which must include full reports of clinical investigations, 21 U.S.C. § 355(b)(1)(A), relevant nonclinical studies, 21 C.F.R. § 314.50(d)(2), "any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source," 21 C.F.R. § (d)(5)(iv), and "the labeling proposed to be used for such drug," 21 U.S.C. § 355(b)(1)(F). The FDA approves an NDA only if it determines that the drug in question is safe for use under its proposed labeling and the drug's probable therapeutic benefits outweigh its risk of harm. 21 U.S.C. § 355(d); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 140. In contrast, a manufacturer of generic drugs can piggyback off of a previously-approved brand-name drug, but is required by federal law to match the preapproved brand-name analogue's labeling and composition *exactly*. 21 U.S.C. § 355(j)(2)(A).

[21] As previously described, a company may not manufacture, much less produce, an aircraft part until its proposed design, to the extent described in its application, has been approved by the FAA in a type certificate. *See supra*, Part I.A. Once approved, there are two basic mechanisms by which a change can be made, depending whether the change

48

design aspect without further preapproval, means a manufacturer may well find it impossible to simultaneously comply with both a type certificate's specifications and a separate—and perhaps more stringent—state tort duty. Thus, there may be cases where a manufacturer's compliance with both the type certificate and a state law standard of care "is a

---

is a "major change" or "minor change." *See* 14 C.F.R. § 21.93. For "major changes," a manufacturer cannot alter its design without obtaining preapproval and an amended type certificate from the FAA. S*ee* 49 U.S.C. § 44704(b); 14 C.F.R. § 21.97. Even where a manufacturer identifies and reports a defect, it may not unilaterally make a major change to its preapproved design; instead, the FAA must either preapprove such a change or issue an airworthiness directive that provides legally enforceable instructions to make the product safe. *See supra*, Part I.A. "Minor changes," on the other hand, "may be approved under a method acceptable to the FAA before submitting to the FAA any substantiating or descriptive data." 14 C.F.R. § 21.95. Importantly, "[t]he FAA permits a wide latitude in the approval process for minor changes to type design," FAA, Order 8110.4C, change 5, Type Certification, ch. 4-1 (2011), allowing, for example, for manufacturers holding a certain, separately-applied-for authorization from the FAA (a so-called "technical standard order authorization") to "make minor design changes . . . without further approval by the FAA," 14 C.F.R. § 21.619(a). Under the regulations, then, it appears that "major changes" to the design aspects expressly set forth in or incorporated into a type certificate require preapproval, whereas "minor changes," depending on the "method acceptable to the FAA," 14 C.F.R. § 21.95, may not.

physical impossibility," *Fla. Lime & Avocado Growers, Inc.*, 373 U.S. at 142-43, or would pose an obstacle to Congress's purposes and objectives. In such cases, the state law claim would be conflict preempted. For, even if an alternative design aspect would improve safety, the mere "possibility" that the FAA would approve a hypothetical application for an alteration does not make it possible to comply with both federal and state requirements: As the Supreme Court observed in *PLIVA*, if that were enough, conflict preemption would be "all but meaningless." 131 S. Ct. at 2579.

As for Appellees' reliance on *Riegel*, we agree that the FAA's type certification process resembles the "'rigorous'" preapproval process for certain medical devices under the Federal Food, Drug, and Cosmetic Act (FDCA), Pub. L. No. 75-717, 52 Stat. 1040 (1939) (amended 1976). *Riegel*, 552 U.S. at 317 (quoting *Lohr*, 518 U.S. at 477). Not unlike type certification, this approval process involves copious submissions and exhaustive review, and the FDA grants approval only if a device is deemed both safe and effective. *Id.* at 317-19. In addition, just as aircraft manufacturers may not make major changes to or deviate from their type certificates without the FAA's sign-off, certain medical device manufacturers may not deviate from a federally sanctioned design without first obtaining supplemental approval from the FDA. *See* 21 U.S.C. § 360e(d)(6)(A)(i); *Riegel*, 552 U.S. at 319. However, unlike the Federal Aviation Act, the statute governing medical devices includes an express preemption clause that forbids states from imposing "requirements" that are "different from, or in addition to" federal requirements placed on medical devices. 21 U.S.C. § 360k(a)(1); *Riegel*, 552 U.S. at 316. Because the Supreme Court's preemption analysis in *Riegel* hinged on its

interpretation of this express preemption clause, the case provides no support for the general proposition that states may not regulate devices governed by a federal statutory scheme.

Moreover, in an important respect, *Riegel* cuts against a finding of field preemption in this case, particularly when read in conjunction with the Court's prior medical device decision in *Lohr*.  Together these cases reflect a narrow, rather than sweeping, approach to analyzing the preemptive contours of a federal premarket approval scheme.  In *Lohr*, finding that the "overarching concern" of the federal statutory and regulatory scheme was ensuring "that pre-emption occur only where a particular state requirement threatens to interfere with a specific federal interest," the Court preserved state common law requirements "equal to, or substantially identical to, requirements imposed under federal law."  518 U.S. at 497, 500-01 (internal quotation marks omitted).  Subsequently, in *Riegel*, although the Court held that state design defect claims were preempted where they imposed additional safety requirements on medical device manufacturers in violation of the express preemption clause, the Court left *Lohr* intact and took care to note that state duties that "'parallel,' rather than add to, federal requirements" are not preempted by the statute.  552 U.S. at 330.   Here, confronted with a similarly exhaustive preapproval process governing aircraft manufacture and design and no express preemption clause, we see no justification for going further than the Supreme Court elected to go in *Riegel* or *Lohr* by deeming categorically preempted even those state requirements that may be consistent with the federal regulatory scheme as embodied in the FAA's type certificates.   We thus read *Riegel* not to bestow field

preemptive effect on type certificates, but rather to counsel in favor of narrowly construing the effect of federal regulations on state law—much like the conflict preemption analysis undertaken in *Bartlett* and *PLIVA*.

### 3. Aviation Preemption Precedent in the Courts of Appeals

With a dearth of support for the proposition that the field of aircraft design and manufacture is preempted, Appellees attempt to muster support from select language in the opinions of other Courts of Appeals. Their efforts are unavailing.

Appellees observe that various Courts of Appeals have described the entire field of aviation safety as preempted, but, on inspection, even those courts have carefully circumscribed the scope of those rulings. The Second, Ninth, and Tenth Circuits all assess the scope of the field of aviation safety by examining the pervasiveness of the regulations in a particular area rather than simply determining whether the area implicated by the lawsuit concerns an aspect of air safety. *See Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1006 (9th Cir. 2013) (inquiring as to "whether the particular area of aviation commerce and safety implicated by the lawsuit is governed by pervasive federal regulations" (quoting *Martin*, 555 F.3d at 811) (alteration and internal quotation marks omitted)); *Goodspeed Airport L.L.C. v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210-11 (2d Cir. 2011) ("[C]oncluding that Congress intended to occupy the field of air safety does not end our task. . . . [T]he inquiry is twofold; we must determine not only Congressional intent to preempt, but also the scope of that preemption. 'The key question is thus at what point the state regulation sufficiently

interferes with federal regulation that it should be deemed pre-empted[.]'" (second alteration in original) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992))); *U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1329 (10th Cir. 2010) ("Based on the pervasive federal regulations concerning flight attendant and crew member training and the aviation safety concerns involved when regulating an airline's alcoholic beverage service, we conclude that NMLCA's application to an airline implicates the field of airline safety that Congress intended federal law to regulate exclusively.").[22]

---

[22] Thus, although described as field preemption, these two-part tests define the relevant "field" so narrowly as to result in an analysis that resembles conventional conflict preemption. *See Williamson*, 562 U.S. at 330 (asking "whether, in fact, the state tort action conflicts with the federal regulation" (citation and internal quotation marks omitted)). Indeed, in *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 103-04 (1992) (plurality opinion), on which the Second Circuit relied in *Goodspeed* to articulate its test, the Supreme Court rested its plurality opinion on conflict preemption rather than field preemption. *See Goodspeed*, 634 F.3d at 209 n.4, 210-11 (recognizing that the categories of preemption "are not rigidly distinct," but that, while field preemption may be considered a "subset of conflict preemption," courts often recognize field preemption and conflict preemption as separate doctrinal categories (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

Notably, several district courts have also rejected field preemption in the aviation context and thereafter considered

53

In any event, to date, the Courts of Appeals have held that aviation products liability claims are not preempted, although they have taken a variety of different approaches to reach that result. *See Martin*, 555 F.3d at 812; *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788-89, 794-95 (6th Cir. 2005); *Pub. Health Trust*, 992 F.2d at 294-95; *Cleveland*, 985 F.2d at 1442-47. The Ninth Circuit has held that the entire field of aviation safety is preempted, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468-69 (9th Cir. 2007), but that products liability claims are not within that preempted field, drawing a line between areas of law where the FAA *has* issued "pervasive regulations"—such as passenger warnings, *id.* (concluding that state law negligence claims for failure to warn passengers of medical risks accompanying long flights are preempted), and pilot qualifications, *Ventress v. Japan Airlines*, 747 F.3d 716, 721-23 (9th Cir.), *cert. denied*, 135 S. Ct. 164 (2014) (holding state law claims implicating pilot qualifications and medical standards fall within the preempted field of aviation safety because "unlike aircraft stairs, [they] are pervasively regulated")—and other areas where the FAA has not—such as products liability claims for allegedly defective airstairs, *Martin*, 555 F.3d at 808-11.

The Tenth and Eleventh Circuits, in addressing products liability claims, have held that not only are those

---

whether conflict preemption applies. *See, e.g.*, *Sheesley v. Cessna Aircraft Co.*, Nos. Civ. 02-4185, 03-5011, 03-5063, 2006 WL 1084103, at *23 (D.S.D. 2006); *Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824, 836 (E.D. Tex. 2006); *Holliday v. Bell Helicopters Textron, Inc.*, 747 F. Supp. 1396, 1400 (D. Haw. 1990).

claims governed by state law, but also that the entire field of aviation safety is not preempted.  *See Pub. Health Trust*, 992 F.2d at 295; *Cleveland*, 985 F.2d at 1447.  While the basis for their broader holdings is now in doubt, [23] both of those

---

[23] The Tenth and Eleventh Circuits both relied in part on *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), and the canon of *expressio unius est exclusio alterius* to conclude that because products liability claims were outside the scope of the ADA's express preemption clause, they were not preempted.  Although this employment of *expressio unius* has been called into question by more recent Supreme Court authority, *see Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872-73 (2000), courts in the Eleventh Circuit continue to apply *Public Health*'s broad holding, *see Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1253-55 (11th Cir. 2003); *Psalmond v. Delta Air Lines, Inc.*, No. 1:13-cv-2327, 2014 WL 1232149, at *3 (N.D. Ga. Mar. 25, 2014); *North v. Precision Airmotive Corp.*, No. 6:08-cv-2020, 2011 WL 679932, at *4-5 (M.D. Fla. Feb. 16, 2011).

The fate of *Cleveland* is less certain.  In *O'Donnell*, the Tenth Circuit reversed course and held that the field of aviation safety is preempted.  *O'Donnell*, 627 F.3d at 1322. Several district courts, including the District Court here, have stated without explanation that *Cleveland* has been abrogated by *O'Donnell.  See, e.g., Sikkelee*, 45 F. Supp. 3d at 448 n.16. While *O'Donnell* narrowed *Cleveland*'s holding, it did not purport to overturn *Cleveland*'s application to products liability claims, but rather concluded that it "does not dictate the outcome in this case."  627 F.3d at 1326.  Thus, *Cleveland*'s holding that products liability claims are not preempted still appears to be the law of the Tenth Circuit.

Circuits still hold that aviation products liability claims are governed by state law.  The Sixth Circuit's approach is most difficult to decipher: In a single opinion, it relied on *Abdullah* for the proposition that "federal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation" yet also applied Kentucky tort law to a design defect products liability claim involving a navigational instrument.  *Greene*, 409 F.3d at 788-89, 794-95.  The most logical reading of *Greene* is that it holds products liability claims not to be preempted, as any other interpretation would render futile its extensive analysis of the design defect claim under state law.  *See Martin*, 555 F.3d at 811; *McWilliams v. S.E., Inc.*, 581 F. Supp. 2d 885, 888-92 (N.D. Ohio 2008).

Even those Courts of Appeals that have not directly addressed the issue have adopted approaches to aviation preemption that suggest they would reach a similar result.  The Seventh Circuit has clearly indicated its understanding that state law applies to aviation products liability claims.  *See Bennett*, 484 F.3d at 908-09 ("Defendants' early theory that federal law occupies the field of aviation safety and thus 'completely preempts' all state law has been abandoned. . . . Illinois tort law supplies the claim for relief.  On that much all parties agree.  For decades aviation suits have been litigated in state court when the parties were not of diverse citizenship.").  And the Fifth Circuit has found field preemption only of the narrower field of passenger safety warnings, *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004), and otherwise has applied state law to aviation products liability claims, *e.g.*, *McLennan*, 245 F.3d at 425-26.

In sum, no federal appellate court has held an aviation products liability claim to be subject to a federal standard of care or otherwise field preempted, and Appellees have been unable to identify a single decision from any court, other than the District Court here, that has held the mere issuance of a type certificate conclusively establishes a defendant's compliance with the relevant standard of care.

### E. The Parties' Policy Arguments

In addition to their legal arguments, the parties present various policy arguments in support of their respective positions.    While we are not unsympathetic to those arguments, they carry no sway in face of clear evidence of congressional intent and the guidance we draw from the Supreme Court's preemption jurisprudence.    Nonetheless, for the sake of completeness, we address those arguments briefly here.

First, in support of field preemption and a federal standard of care, Appellees and their amici warn that allowing state tort law to govern design defect claims will open up aviation manufacturers to tremendous potential liability and the unpredictability of non-uniform standards applied by juries throughout the states.    *See, e.g.*, Br. of Amicus Curiae Gen. Aviation Mfrs. Ass'n 18-24.    Even if we accepted the premise that members of the aviation manufacturing industry would suffer more harm from exposure to tort liability than any other manufacturer that sells its products in all fifty states, this policy argument could not lead us to find field preemption without the requisite congressional intent.    And as even the FAA acknowledges, "[a]lthough allowing a defendant to be held liable for a design defect in an engine that has received a type certificate from the FAA is in some

tension with Congress's interest in national uniformity in safety standards with oversight by a single federal agency, Congress struck a balance between protecting these interests in uniformity and permitting States to compensate accident victims." FAA Ltr. Br. 12.

Nor are we moved by Appellees' predictions of the dire consequences to aircraft and component manufacturers of permitting products liability claims to proceed under state tort law, for our holding does not effect a sea change. On the contrary, it simply maintains the status quo that has existed since the inception of the aviation industry, preserving state tort remedies for people injured or killed in plane crashes caused by manufacturing and design defects. That status quo leaves intact the traditional deterrence mechanism of a state standard of care, with attendant remedies for its breach. Thus, while perhaps contrary to certain policies identified by Appellees and their amici, our holding furthers an overriding public policy and one we conclude is consistent with the Federal Aviation Act, FAA regulations, GARA, and decisions of the Supreme Court and our sister Circuits: promoting aviation safety. *See* 49 U.S.C. §§ 40101(a)(1)-(3), 44701(a).

On the other side of this debate, in arguing that type certificates should have no significance for conflict preemption, much less field preemption, Appellant contends that FAA preapproval of particular specifications provides no assurance of safety because the FAA delegates ninety percent of its certification activities to private individuals and organizations, known as designees, which can include the manufacturers themselves. U.S. Gov't Accountability Office, GAO-05-40, *Aviation Safety: FAA Needs to Strengthen the Management of Its Designee Programs* 3 (2004); *see also Junhong v. Boeing Co.*, 792 F.3d 805, 808 (7th Cir. 2015)

("Instead of sending a cadre of inspectors to check whether every aircraft design meets every particular of every federal rule and policy, the FAA allows [manufacturers] to do some of the checking [themselves]."). We too have recognized that designees receive inconsistent monitoring and oversight from the FAA, and many have some association with the applicant, so that in essence "[s]ome manufacturers are able to grant themselves a type certificate." *Robinson v. Hartzell Propeller, Inc.*, 454 F.3d 163, 166 (3d Cir. 2006); *see also Varig Airlines*, 467 U.S. at 818 n.14 (expressing concern that the staff of the FAA "performs only a cursory review of the substance of the overwhelming volume of documents submitted for its approval" (alteration, internal quotation marks, and citation omitted)). Even the FAA acknowledges that, "[i]n light of its limited resources," the agency designates outside organizations to perform some of the FAA's work in preparing a type certificate. FAA Ltr. Br. 14. From these alleged "flaws" in the review process, Appellant argues that the agency preapproval of specifications in the type certificate amounts to an unreliable self-policing regime that should play no role in even conflict preemption.

This very same argument, however, was raised in *Bartlett* and failed to carry the day. While the dissenters decried that granting "manufacturers of products that require preapproval . . . *de facto* immunity from design-defect liability" would force the public "to rely exclusively on imperfect federal agencies with limited resources," *Bartlett*, 133 S. Ct. at 2495 (Sotomayor, J., dissenting), the majority held that because generic drug manufacturers are required to directly mirror the preapproved labels of their brand-name counterparts and are thus "prohibited from making any unilateral changes" to their labels, state law design defect

claims were foreclosed by "a straightforward application of pre-emption law," *id.* at 2471, 2480. Although the resource limitations and extent of outsourcing of parts of the review process highlight the need for the FAA's vigilant oversight, the FAA still makes the ultimate decision to approve the particular design specifications sought in a type certificate. 49 U.S.C. § 44704(a); 14 C.F.R. § 21.21. Thus, the reasoning of the *Bartlett* majority, 133 S. Ct. at 2473, 2480, and the consideration we must give to the FAA's views under separation of powers principles, *see Wyeth*, 555 U.S. at 576-77, lead us to conclude that the FAA's preapproval process for aircraft component part designs must be accorded due weight under a conflict preemption analysis.

In sum, the parties' policy arguments notwithstanding, the case law of the Supreme Court and our sister Circuits confirm our conclusion: We are dealing with an area at the heart of state police powers, and we have no indication of congressional intent to preempt the entire field of aviation design and manufacture. We therefore decline the invitation to create a circuit split and to broaden the scope of *Abdullah's* field preemption to design defects when the statute, the regulations, and relevant precedent militate against it.

## IV.    <u>Conclusion</u>

We conclude that the District Court erred in granting summary judgment on Sikkelee's design defect claims on the basis of field preemption. The field of aviation safety we identified as preempted in *Abdullah* does not include product manufacture and design, which continues to be governed by state tort law, subject to traditional conflict preemption

principles.    Accordingly,  we  will  vacate  and  remand  for further proceedings consistent with this opinion.[24]

_____

[24] Appellees should address to the District Court in the first instance their argument that Sikkelee's claims fail as a matter of Pennsylvania law.  Given the basis for its judgment, the District Court had no need to reach that question and it is not  fairly  encompassed  within  the  order  certified  for  this interlocutory appeal.  *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 407 (3d Cir. 2000) (declining to consider on interlocutory appeal issues unaddressed by the district court below).